1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF MICHIGAN
 2                       SOUTHERN DIVISION

 3     _____

 4     UNITED STATES OF AMERICA,

 5                         Plaintiff,
                                           DOCKET NO. 1:20-cr-183
 6     vs.

 7

       BARRY GORDON CROFT, JR.,
 8
                         Defendant.
 9     _____/

10

11          TRANSCRIPT OF ARRAIGNMENT, INITIAL PRETRIAL

12     CONFERENCE, DETENTION HEARING, AND HEARING ON DEFENDANT'S

13               MOTION FOR IMMEDIATE RELEASE

14       BEFORE UNITED STATES MAGISTRATE JUDGE SALLY J. BERENS

15                     GRAND RAPIDS, MICHIGAN

16                       January 13, 2021

17

18     Court Reporter:            Glenda Trexler
                                   Official Court Reporter
19                                 United States District Court
                                   685 Federal Building
20                                 110 Michigan Street, N.W.
                                   Grand Rapids, Michigan 49503
21

22     Proceedings reported by audio recording, transcript produced by

23     computer-aided transcription.

24

25

```
 1   A P P E A R A N C E S:

 2   FOR THE GOVERNMENT:

 3        MR. NILS R. KESSLER
          UNITED STATES ATTORNEY'S OFFICE
 4        330 Ionia Avenue, N.W.
          P.O. Box 208
 5        Grand Rapids, Michigan 49501-0208
          Phone:  (616) 456-2404
 6        Email:  Nils.Kessler@usdoj.gov

 7   FOR THE DEFENDANT:

 8        MR. JOSHUA ADAM BLANCHARD
          BLANCHARD LAW
 9        309 South Lafayette Street, Suite 208
          P.O. Box 938
10        Greenville, Michigan 48838
          Phone:  (616) 773-2945
11        Email:  josh@blanchard.law

12                      *   *   *   *   *

13                            Grand Rapids, Michigan

14                            January 13, 2021

15                            4:04 p.m.

16              P R O C E E D I N G S

17        THE COURT:  Good afternoon.  This is the date and time

18   set for a number of hearings.  An arraignment and initial

19   pretrial conference as well as a bond hearing and a hearing on

20   the defendant's motion for immediate release.

21        Let's start with appearances and introductions.

22        MR. KESSLER:  Good afternoon, Your Honor, Nils Kessler

23   for the United States.

24        THE COURT:  Good afternoon.

25        MR. BLANCHARD:  Good afternoon, Your Honor,
```

1    Josh Blanchard on behalf of Mr. Croft who is seated to my

2    right.

3              THE COURT:  Good afternoon to you, Mr. Blanchard.

4    Good afternoon to you, Mr. Croft.

5              THE DEFENDANT:  Good afternoon, ma'am.

6              THE COURT:  All right.  As you just heard me say,

7    Mr. Croft, there are a number of hearings that we're going to

8    take up today.  The first of those will be an arraignment at

9    which I'm going to apprise you of what you've been charged with

10   and what the penalties could be for that.  And at the end of

11   that you'll be able to enter a plea.

12             There will also be an initial pretrial conference

13   which is a very brief proceeding at which the parties can raise

14   any discovery issues that have come up so far or that they

15   foresee in the future.

16             In addition, we will have a bond hearing and hearing

17   on your motion for immediate release.

18             As an initial matter, I believe this is the first

19   hearing since the enactment of Rule 5(f) at which both counsel

20   have been present, so we will issue a written Rule 5(f) order,

21   and I incorporate that order as an oral order as well.

22             All right.  Mr. Croft, how far did you get in school?

23             THE DEFENDANT:  I graduated high school.

24             THE COURT:  All right.  So able to read, write, and

25   understand English just fine?

1          *THE DEFENDANT:*  Yes, ma'am.

2          *THE COURT:*  All right.  Anything bothering you today

3    physically or mentally that would make it difficult for you to

4    understand what's happening in court?

5          *THE DEFENDANT:*  No, ma'am.

6          *THE COURT:*  All right.  Have you taken any

7    medications, other drugs, or alcohol in the last 24 hours?

8          *THE DEFENDANT:*  I have not, ma'am.

9          *THE COURT:*  All right.  You have the right to remain

10   silent, and anything you do say could be used against you.  You

11   also have the right to have an attorney with you throughout

12   these proceedings.

13         Mr. Blanchard was conditionally appointed to represent

14   you.  Are you asking that I appoint him for the remainder of

15   the term of your proceedings here?

16         *THE DEFENDANT:*  Yes, ma'am.

17         *THE COURT:*  Okay.  And did you provide the information

18   that was used to fill out this financial affidavit?

19         *THE DEFENDANT:*  I did, ma'am.

20         *THE COURT:*  Is all that information true and correct?

21         *THE DEFENDANT:*  Yes, ma'am.

22         *THE COURT:*  And is that your signature at the bottom?

23         *THE DEFENDANT:*  Yes, ma'am.

24         *THE COURT:*  All right.  I find that you do qualify for

25   appointed counsel and Mr. Blanchard will be continued as your

1     appointed attorney.

2            Mr. Blanchard, has he had an opportunity to sign

3     the -- to review and sign the Advice of Rights form?

4            *MR. BLANCHARD:*  Yes, Your Honor.

5            *THE COURT:*  All right.  So before this hearing,

6     Mr. Croft, you were given a form that sets out your

7     constitutional rights in this matter.  Did you read and

8     understand that form before you signed it?

9            *THE DEFENDANT:*  Yes, ma'am, I did.

10           *THE COURT:*  Have you also had an opportunity,

11    Mr. Croft, to review the Indictment with your counsel?

12           *THE DEFENDANT:*  Yes, ma'am, I have.

13           *THE COURT:*  All right.  You are charged with one count

14    of a kidnapping conspiracy, and what is charged here is that

15    from about June 6th of 2020 through October 7th of 2020, here

16    in the Western District of Michigan and elsewhere, that you and

17    a number of other people willingly and knowingly combined,

18    conspired to violate 18 U.S.C. § 1201(a).  Specifically that

19    you conspired to kidnap the governor of the State of Michigan.

20           I don't want you to say anything about the charge, but

21    do you understand what you're being charged with?

22           *THE DEFENDANT:*  Yes, ma'am.

23           *THE COURT:*  Okay.  The maximum penalties for that

24    crime if you were convicted would include incarceration up to

25    your lifetime, a fine of up to $250,000, supervised release of

1    not more than five years, and a special assessment of a hundred

2    dollars.

3          Do you understand what the penalties could be?

4          THE DEFENDANT:  Yes, ma'am.

5          THE COURT:  There is also a forfeiture allegation in

6    the Indictment.  That is not a separate charge, rather it is

7    the government's way of putting you on notice that it intends

8    to seize any firearms and ammunition involved in the commission

9    of the offense.

10         Do you understand the concept of a forfeiture

11   allegation?

12         THE DEFENDANT:  Yes, ma'am.

13         THE COURT:  Very well.  There are four ways that you

14   can plead.  You could plead not guilty, you could plead guilty.

15   With the approval of the district court judge, in this case

16   Judge Jonker, and the United States Attorney's Office, you

17   could enter a plea of no contest.  Or you could stand mute in

18   which case a not-guilty plea would be entered on your behalf.

19         Mr. Blanchard, how does he plead?

20         MR. BLANCHARD:  I would ask the Court to enter a

21   not-guilty plea.

22         THE COURT:  Very well, a not-guilty plea will be

23   entered.

24         That concludes the arraignment and brings us to the

25   initial pretrial conference.

1          Mr. Kessler, is your Initial Pretrial Conference

2   Summary Statement in order?

3          MR. KESSLER:  Yes, Your Honor.

4          THE COURT:  All right.  Mr. Blanchard, any questions

5   for Mr. Kessler?

6          MR. BLANCHARD:  Not at this time.

7          THE COURT:  All right.  And, Mr. Kessler, anything

8   else that you're aware of that we need to raise today?

9          MR. KESSLER:  I don't think so today, Your Honor.

10  Thank you.

11         THE COURT:  All right.  Mr. Blanchard, anything else

12  from you?

13         MR. BLANCHARD:  Not today.

14         THE COURT:  All right.  As I said, Mr. Croft, it's

15  generally a pretty brief proceeding.

16         That brings us to the question of the defendant's

17  bond.  However, it probably makes sense to address the

18  defendant's motion at this point as well.

19         Do the parties wish to add anything in terms of

20  argument related to that motion?

21         MR. BLANCHARD:  No.  I mean, I think the motion is

22  kind of going to be mooted by, you know, whatever happens on

23  the bond, so . . .

24         THE COURT:  All right.  Mr. Kessler, anything else?

25         MR. KESSLER:  I agree, Your Honor.

1          *THE COURT:*  All right.  Well, the motion deals with

2     the immediate release because of the failure to transport.  Now

3     that Mr. Croft is here, that is mooted to some degree in any

4     case.

5               I do want to put some facts on the record because

6     there is a requirement that a motion under that provision,

7     specifically 18 U.S.C. 3145(b), occur promptly.  And I want to

8     just put on the record, in addition to the facts that the

9     government has proffered, some additional information in terms

10    of the steps that the Court took to bring Mr. Croft to the

11    district.

12              Even in advance of the Indictment in this case and

13    certainly in advance of the defendant's motion, the

14    U.S. Marshal Service had apprised the Court that there was an

15    issue with transferring Mr. Croft from FDC Philadelphia.

16    Specifically a large outbreak of coronavirus infections have

17    resulted in the lockdown of a number of units in that facility,

18    including -- reported to us anyway -- one or more in which

19    Mr. Croft was housed.

20              The Court has been attempting to secure Mr. Croft's

21    appearance for an arraignment and bond hearing either by video

22    from Philadelphia or in person since, as I said, before the

23    defendant's motion was filed.  I'm not going to detail the

24    extent of the Court's efforts to provide a hearing, but they

25    have been diligent and substantial.

1          My staff made repeated inquiries, as I said, even in

2    advance of Mr. Croft's motion to FDC Philadelphia to arrange a

3    video arraignment.  We made efforts also through the District

4    of Delaware which assisted our attempts to arrange a video

5    arraignment.  At one point we were informed that Mr. Croft's

6    unit was quarantined which prevented his access apparently to

7    video conference facilities.

8          I'm not in a position to assess those representations,

9    but they did frustrate the Court's ability to secure

10   Mr. Croft's appearance for an arraignment and a bond hearing

11   and a hearing on the defendant's motion until today.

12         The first date that we were able to schedule Mr. Croft

13   to appear by video was actually tomorrow.  And if, however, his

14   unit was at that point on quarantine, we had no guarantee that

15   he would be produced for that video hearing.

16         Ultimately the United States Marshal Service in this

17   district undertook special efforts to transport Mr. Croft to

18   this district yesterday, and that is why he is present today.

19         I think I do have to give a substantive response to

20   the motion, so I'll do that really briefly today.  Mr. Croft

21   cited no authority for the proposition that release from

22   pretrial detention is an authorized remedy for pre-indictment

23   delay in transporting him from the district of arrest.

24   Certainly that delay cannot be indefinite and the concerns

25   raised in the motion are well taken.  I am sympathetic to those

1    concerns.  But the provision that Mr. Croft cited,

2    Section 3161, yields that the excludability of transportation

3    delays from the requirement that the defendant be brought to

4    trial within 70 days of indictment or appearance in the

5    charging district, whichever occurs later.  So that presumption

6    is not controlling here.

7         Moreover, as the government noted in its brief and

8    cited at least one case, the extraordinary challenges presented

9    by the COVID-19 pandemic in this context have been acknowledged

10   by the courts.  While the pandemic cannot be an excuse for a

11   failure of diligence, I do not have a record before me that

12   suggests that the U.S. Marshal Service was not diligent in its

13   efforts to secure Mr. Croft's appearance in the district.

14   Indeed, as I said, deputies in this district took unusual

15   measures to transport him this week.

16        And given that Mr. Croft is now present in the

17   district and the government's motion for detention will be

18   heard today, his motion for revocation of the detention order

19   in the District of Delaware or for an order securing his

20   appearance within the district is denied.

21        So that brings us to the government's motion for

22   detention.  Mr. Kessler, how would you like to proceed?

23        *MR. KESSLER:*  We're ready, Your Honor, if the

24   defendant would like to run the hearing.

25        *MR. BLANCHARD:*  Yes, Your Honor.

```
 1              THE COURT:  All right.  Very well.

 2              MR. KESSLER:  The government calls

 3   Special Agent Richard Trask.

 4              MR. BLANCHARD:  And I'm sorry, can I use my

 5   electronics?

 6              THE COURT:  Absolutely.

 7              MR. BLANCHARD:  Thank you.

 8              MR. KESSLER:  Just for purposes of making it easier

 9   for the court reporter, shall I leave the mask on, or which is

10   the Court's preference?

11              THE COURT:  You know, I can hear you just fine.  So if

12   you're comfortable in it, that's fine.  You're kind of far away

13   from everybody else, so if you're having difficulty, that's

14   okay too.

15              MR. KESSLER:  If I start passing out, I'll take it

16   off.

17              THE COURT:  That would be great.

18              THE CLERK:  Please raise your right hand.

19                        RICHARD J. TRASK, II

20                   (The oath was administered)

21              THE WITNESS:  I do.

22              THE CLERK:  Please take a seat and state your -- and

23   spell your name for the record.

24              THE WITNESS:  Special Agent Richard J. Trask, II,

25   T-R-A-S-K.
```

1          *MR. KESSLER:*  And, Your Honor, I'm going to turn on

2     the sound on my computer now which I've had off so we can play

3     some recordings here.

4          Before we get started, Your Honor, I have a couple of

5     exhibits that I'm going to hand the Court, unless you are --

6     you already have them, Your Honor?

7          *THE COURT:*  I believe I have Government Exhibits --

8     Proposed Exhibits 1, 2 --

9          *MR. KESSLER:*  There's a video.

10         *THE COURT:*  -- 3, I believe.

11         *MR. KESSLER:*  Yes, Your Honor.  There's a video and

12    some audio recordings that we'll be showing you through the

13    computer.  The physical pictures here are actually just

14    pictures of what you're also going to see on the screen.  And

15    the transcript that we have here, a couple of these recordings

16    are fairly quiet because they are undercover recordings that

17    were taken from inside someone's pocket, for example.  We did

18    test it out before we came on the record here today, and I

19    think with this transcript they should being understandable.

20         *THE COURT:*  All right.

21                         DIRECT EXAMINATION

22    *BY MR. KESSLER:*

23    *Q.*  So good afternoon, Agent Trask.

24    *A.*  Good afternoon.

25    *Q.*  Now, you're a special agent with the FBI in the Kalamazoo

1    resident agency, correct?

2    A.   That's correct.

3    Q.   How long have you been employed there?

4    A.   Approximately 10 years almost.

5    Q.   Okay.  And you're one of the primary assigned case agents

6    on the kidnapping conspiracy that we're here for today?

7    A.   That's correct.

8    Q.   You testified in the preliminary examinations and detention

9    hearings for the other defendants back in October, right?

10   A.   I did.

11   Q.   And you've had a chance to review the Indictment that's

12   been returned by the grand jury since then?

13   A.   Yes, I have.

14   Q.   All right.  Fair to say that's an accurate summary of what

15   you testified to back in October?

16   A.   Yes, it is.

17   Q.   Okay.  Let's just hit a couple of high points that involve

18   Mr. Croft since he's the only one that we're here on today.

19       I want to go back to the beginning of the conspiracy noted

20   in the Indictment.  It says that the conspiracy began on

21   June 6th.  What happened on June 6th briefly?

22   A.   That was a meeting of like-minded individuals that took

23   place in Ohio.

24   Q.   When you say like-minded individuals, what kind of people

25   are we talking about?

*DIRECT EXAMINATION OF RICHARD J. TRASK, II*                    14

1   A.   Militia members or militia-affiliated members from Delaware

2   and Michigan amongst other states at that time.

3   Q.   What were they meeting there to discuss?

4   A.   They were discussing the plans to potentially move forward

5   on how they were going to deal with kind of the frustrations of

6   the lockdown and other orders going on to include kidnapping

7   governors or attacks on other individuals at MSP stations and

8   whatnot.

9   Q.   All right.  So they weren't there to just talk about like

10  protesting or anything, they had more concrete plans in mind?

11  A.   That's correct.

12  Q.   And how did the FBI know about what happened at that

13  meeting?

14  A.   We had a confidential human source who was in that meeting

15  and provided that information back to us.

16  Q.   And you have recordings of some of what went on there,

17  right?

18  A.   That's correct.

19  Q.   Okay.  Let's talk specifically about Mr. Croft.  What was

20  his role among the people who attended that meeting?

21  A.   In the view of the people that attended the meeting, at the

22  time he was seen as the de facto leader of the group or kind of

23  the co-- the main person.

24  Q.   Okay.  Was he the leader of anything else as far as you are

25  aware from your investigation?

1   *A.*  He was aware -- the leader of the Three Percenters at the

2   time.

3   *Q.*  Okay.  He held himself out at as the leader of the

4   Three Percenters?

5   *A.*  That's correct.

6   *Q.*  Can you briefly tell the Court what the Three Percenters

7   are?

8   *A.*  The Three Percenters are a smaller sect of the militia that

9   is more intent on actually committing more aggressive acts or

10  doing more outward acts as opposed to just training in the

11  typical militia-type situations.

12  *Q.*  All right.  Would you characterize them as militia violent

13  extremists?

14  *A.*  Yes.

15  *Q.*  Okay.  And I noted in the Presentence -- or the

16  Pretrial Services Report that Mr. Croft denied belonging to any

17  militia groups.  Does the Three Percenters have a particular

18  logo that is always associated with them?

19  *A.*  Yes, they do.

20  *Q.*  What does it look like?

21  *A.*  I believe he has a tattoo from what I saw on his hand, and

22  it is three Roman numerals with several stars around it.

23         *MR. KESSLER:*  And Mr. Croft -- with the Court's

24  permission, I would ask Mr. Croft to hold up his left hand for

25  the Court to observe.

1          *THE COURT:*  Thank you.

2    *Q.  (BY MR. KESSLER)*  So that's what you -- I'm going to --

3    just for the record, it's a Roman numeral III surrounded by

4    stars.  That's the same logo that you saw on his hand?

5    *A.*  That's correct.

6    *Q.*  Did you see that on anybody who was part of the assault on

7    the Capitol last week?

8    *A.*  Yes, we did.

9    *Q.*  The Three Percenters were a --

10          *MR. BLANCHARD:*  I'm going to object to the relevance

11   of stuff that happened at the Capitol last week.  My client has

12   been in custody for three months.

13          *MR. KESSLER:*  I'm not suggesting that he was part of

14   it, but he is clearly part of and has held himself out as a

15   national leader of a militant violent extremist group and he's

16   asking to be released from custody, so the fact that he's a

17   leader of a group that assaulted the Capitol last week should

18   have some bearing on whether it's a good idea to let him out.

19          *THE COURT:*  This is a bond hearing.  There's a lot of

20   latitude.  How much weight I give to it ultimately is a

21   different question.  But I'll allow it.

22          *MR. KESSLER:*  Thank you, Your Honor.

23   *Q.  (BY MR. KESSLER)*  So let me show you Government Exhibit 1

24   for identification.  This is a photograph of Barry Croft,

25   correct?

1  A.  That's correct.

2  Q.  Okay.  And what's he holding up there?

3  A.  He's holding a Boogaloo flag.

4  Q.  Now, when you say it's a Boogaloo flag, for the record

5  again, it appears to be a blue flag with what looks like some

6  floral patterns on it?

7  A.  That's right.

8  Q.  What's the association -- first off, what is the Boogaloo?

9  A.  Boogaloo is a movement that is essentially looking at the

10  overthrow of the government and establishing their own.  Their

11  own government or their own people in place.

12  Q.  Are they interested in fomenting a second civil war?

13  A.  Yes.

14  Q.  So why would the floral patterns or the Hawaiian patterns

15  be associated with the Boogaloo movement?

16  A.  It had to do with -- at the time something with the luaus

17  out of Hawaii and because the luau kind of sounded like a

18  Boogaloo, they ended up going with the Hawaiian pattern as

19  their name.  Or as their representation for their movement.

20  Q.  Okay.  So they went from Boogaloo to Big Luau --

21  A.  Yes.

22  Q.  -- hence the Hawaiian motifs?

23  A.  Yes.

24  Q.  And the flag also has what looks like a semiautomatic rifle

25  on the flag?

1    A.   That's correct.

2    Q.   It looks like he has another tattoo that says "We the

3    People"; is that correct?  On his forearm?

4    A.   I believe so.   I can't see that picture.

5    Q.   I'll see if I can blow that up.

6    A.   That's correct.

7    Q.   Okay.   And the three-cornered hat?

8    A.   The three-cornered hat is symbolic of, if you go back in

9    the history, of kind of leadership or commanders of continental

10   armies and such.

11   Q.   All right.   And the Three Percenter thing, they hold

12   themselves out -- what was the myth?   Like only three percent

13   of the colonists fought the British or something?

14   A.   I believe -- I'm not a hundred percent sure, but I believe

15   it's something along those lines.

16   Q.   Okay.   Are most of the people involved with this particular

17   movement, the Boogaloo and the Three Percenters, also weapons

18   enthusiasts?

19   A.   They are.

20        MR. KESSLER:  First let me offer Exhibit 1 into

21   evidence.

22        THE COURT:  Any objection?

23        MR. BLANCHARD:  No.

24   Q.   (BY MR. KESSLER)  I'm going to show you now Exhibit 2 for

25   identification.   Is that also Barry Croft?

1  A.  That is.

2  Q.  What type of weapon are we looking at that he's holding

3  here?

4  A.  It appears to be a semiauto shotgun.

5  Q.  And anything interesting -- anything unusual about the end

6  of the barrel there?

7  A.  I'm not sure if that is an addition to it or if that is a

8  self-manufacture, but it appears to be sharpening the points at

9  the end with the implication that you could potentially stab or

10 use that as another means of aggression forward.

11 Q.  So not a lot of normal sporting purposes for having

12 sharpened prongs on the end of your barrel?

13 A.  No, there are not.

14 Q.  And he seems to be dressed in paramilitary gear with a lot

15 of ammunition clips on it?

16 A.  That's correct.

17 Q.  Let's go back to Dublin, Ohio, which was that meeting on

18 June 6th.  The meeting of militia members.  You said they

19 discussed the need to overthrow the government and kidnap

20 governors?

21 A.  That's correct.

22 Q.  Did Mr. Croft on those recordings that you've listened to

23 actually talk about kidnapping governors himself?

24 A.  Yes, he did.

25 Q.  Did he discuss blowing things up and committing terroristic

*DIRECT EXAMINATION OF RICHARD J. TRASK, II*                    20

1    acts?

2    *A.*  Yes, he did.

3    *Q.*  Let me tell you what we've marked --

4          *MR. KESSLER:*  First off let me offer Exhibit 2 for

5    identification.

6          *THE COURT:*  You mean for admission?

7          *MR. KESSLER:*  For admission.

8          *THE COURT:*  Any objection?

9          *MR. BLANCHARD:*  I'll leave it to the Court.

10         *THE COURT:*  And I don't believe I've ever said it

11   either, but both Government Exhibits 1 and 2 are admitted.

12         *MR. KESSLER:*  Thank you, Your Honor.

13   *Q.*  *(BY MR. KESSLER)*  I'm going to play now

14   Government Exhibit 3 for identification, and everybody I think

15   has the transcript there to be able to follow along hopefully.

16         *THE COURT:*  I do.

17         Do you have a copy of the transcript, Mr. Blanchard?

18         *MR. BLANCHARD:*  I do.

19   *Q.*  *(BY MR. KESSLER)*  So this is a recording of Mr. Croft

20   talking to the group in Dublin, correct?

21   *A.*  That's correct.

22        *(Audio playing)*

23   *Q.*  And you've listened to these recordings.  There's a fair

24   amount of that type of religious talk in here?

25   *A.*  Yes.

*DIRECT EXAMINATION OF RICHARD J. TRASK, II*          21

1   *Q.*  Mr. Croft is saying he's been granted permission by God to

2   commit murder, correct?

3   *A.*  That's correct.

4           *MR. KESSLER:*  I would offer Exhibit 3 into evidence,

5   Your Honor.

6           *THE COURT:*  Any objection?

7           *MR. BLANCHARD:*  We're talking about the audio or the

8   transcript or both?

9           *MR. KESSLER:*  The audio.  The transcript is just to

10  help everyone here.

11          *MR. BLANCHARD:*  Well, I'll leave it to the Court.

12          *THE COURT:*  It's admitted.

13          *MR. KESSLER:*  Thank you, Your Honor.

14  *Q.*   *(BY MR. KESSLER)*  I'll now play Exhibit 4.  It's a

15  recording from the same meeting, correct?

16  *A.*  Yes.

17      *(Audio playing)*

18          *MR. KESSLER:*  All right.  I'll now offer 4 into

19  evidence, Your Honor.

20          *THE COURT:*  Any objection?

21          *MR. BLANCHARD:*  I'll leave it to the Court's

22  discretion.

23          *THE COURT:*  Admitted.

24  *Q.*   *(BY MR. KESSLER)*  And a little later this separate

25  recording from the same meeting, Exhibit 5?

1    A.   That's correct.

2         *(Audio playing)*

3              *MR. KESSLER:*  I'll now offer Exhibit 6 into evidence,

4    Your Honor.

5              *THE COURT:*  I'm sorry, was that 5 or --

6              *MR. KESSLER:*  I'm sorry, it was 5.  You're right.

7              *THE COURT:*  It's admitted.

8              Any objection?

9              *MR. BLANCHARD:*  No.

10             *THE COURT:*  It's admitted.

11   Q.   *(BY MR. KESSLER)*  All right.  So we've heard some of the

12   recordings from that meeting, Agent Trask.  Is it fair to say

13   that they discussed going back to their home states after that?

14   A.   They did.

15   Q.   What did they discuss at this meeting about what every

16   attendee at the meeting was supposed to do after they got back

17   to their home states?

18   A.   After they went back they were supposed to recruit people

19   for the plan to kidnap and kill governors and to assist with

20   the overthrow and then have that built group and come back and

21   bring it together as a whole.

22   Q.   And we've heard some evidence about what Mr. Fox and the

23   other defendants did here in Michigan.  Mr. Croft was in

24   Delaware, right?  He lived in Delaware, correct?

25   A.   That's correct.

1  *Q.*  Did he talk about a willingness to travel to other states

2  to train and commit these kind of acts?

3  *A.*  Yes, he did.

4  *Q.*  Okay.  And let's talk about one he actually did that.  Did

5  he travel to Wisconsin and Michigan to train with the other

6  coconspirators?

7  *A.*  Yes, he did.

8  *Q.*  Let's focus your attention on July 11th and 12th.  Did the

9  group meet in a town called Cambria, Wisconsin?

10  *A.*  That's correct.

11  *Q.*  What was the purpose of them meeting there?

12  *A.*  For training.  They were doing weapons training amongst

13  other various skill training.

14  *Q.*  Okay.  Now, when you say -- let's talk about the skills

15  that they were training for.

16  *A.*  Okay.

17  *Q.*  Besides just practicing like shooting at targets, did they

18  construct something called a shoot house or a kill house?

19  *A.*  Yes, they did.

20  *Q.*  Can you describe what that is and what the purpose of it

21  was?

22  *A.*  A shoot house is set up to simulate rooms that allows for

23  breaching doorways, for tactics going into the room, clearing

24  rooms, identifying individuals to include shoot/no shoot

25  targets or to remove certain individuals or whatnot from these

1  rooms.

2  *Q.*  All right.  And from listening to the undercover recordings

3  up to this point they had been talking about assaulting the

4  Capitol, correct?

5  *A.*  That's correct.

6  *Q.*  And then later kind of morphed that into trying to kidnap

7  the governor from her residence?

8  *A.*  That's correct.

9  *Q.*  Okay.  So this type of training was training for that?

10  *A.*  Yes.

11  *Q.*  Okay.  You mentioned other skills training.  Did they also

12  do medical training?

13  *A.*  Yes, they did.

14  *Q.*  What was the purpose of that?

15  *A.*  Medical training for caring for their members should

16  they -- anybody be shot or injured during the actual operation.

17  *Q.*  So this wasn't things like learning how to deal with, you

18  know, a sore throat or something like that, right?

19  *A.*  No.

20  *Q.*  It was for dealing with combat injuries?

21  *A.*  That -- that's correct.

22  *Q.*  Things like putting tourniquets on a shot limb or whatever?

23  *A.*  Yes.

24  *Q.*  Okay.  Let me show you Exhibit 6 which is a video recording

25  from the training session.  And who is in this video?

1    A.  Mr. Croft and another individual.

2    Q.  Okay.

3        (Video playing)

4        Let me point out a couple of things from the video and ask

5    you about them just for the record.  The three-cornered hat,

6    that's the same one we see Mr. Croft wearing in the earlier

7    picture?

8    A.  Yes, it appears to be.

9    Q.  And you recognize that rifle too, correct?

10   A.  That's correct.

11   Q.  And we're going to come back to that in a moment, but is

12   that rifle in FBI custody at this point?

13   A.  Yes, it is.

14   Q.  Okay.  And we know that's his rifle because he gave it to a

15   confidential human source, correct?

16   A.  That's correct.

17   Q.  All right.  Now, we saw him shooting from behind a barrel

18   and then running to another barrel and shooting and running to

19   another one.  What would be the purpose of that kind of drill?

20   A.  In law enforcement we would use those type of drills for

21   movement -- moving from positions so we're not staying in the

22   same spot or to address different threats at different

23   locations.

24   Q.  So this would be a combat drill basically?

25   A.  That's correct.

1    *Q.*  Learning how to take cover while people are shooting back

2    at you?

3    *A.*  That's correct.

4    *Q.*  And that's what they anticipated running into if they tried

5    to storm the Capitol or kidnap the governor, right?

6    *A.*  Yes.

7    *Q.*  Okay.  Besides bringing this rifle did Mr. Croft bring

8    anything else that was noteworthy to the training session in

9    Cambria, Wisconsin?

10   *A.*  Yes.  He brought an IED or improvised explosive device.

11   *Q.*  What was that made from?

12   *A.*  Made from multiple materials to include shrapnel and other

13   readily available items.

14   *Q.*  What is the purpose of shrapnel?

15   *A.*  Shrapnel is to project out from the explosion and create as

16   much damage or peripheral damage from the explosion site.

17   *Q.*  So it's an antipersonnel device, correct?

18   *A.*  That's correct.

19   *Q.*  All right.  And he's the one who brought it and constructed

20   it at the meeting?

21   *A.*  Yes.

22           *MR. KESSLER:*  I would offer Exhibit 6 into evidence,

23   Your Honor.

24           *THE COURT:*  Any objection?

25           *MR. BLANCHARD:*  No objection.

1      *THE COURT:*  It's admitted.

2    *Q.  (BY MR. KESSLER)*  And they also discuss -- Mr. Croft

3    actually was recorded at that meeting as well, right?  Talking

4    about plans to --

5    *A.*  That's correct.

6    *Q.*  -- conduct their kidnapping?

7    *A.*  Yes.

8    *Q.*  Okay.  I think I'm going to turn the volume down a little

9    bit because this one is a little clearer recording.  I'm going

10   to play for you one of those recordings which is Exhibit 7 for

11   identification.

12       *(Audio playing)*

13       *MR. KESSLER:*  I now offer Exhibit 7 into evidence,

14   Your Honor.

15       *THE COURT:*  Any objection?

16       *MR. BLANCHARD:*  No.

17       *THE COURT:*  It's admitted.

18   *Q.  (BY MR. KESSLER)*  All right.  So we've covered that

19   Mr. Croft traveled from his home to Wisconsin to train with

20   these other defendants.  Did he also come back to Michigan on

21   the weekend of September 12th through the 13th?

22   *A.*  That's correct.

23   *Q.*  And that was to Luther, Michigan?

24   *A.*  Yes.

25   *Q.*  And what was the purpose of that trip?

1   A.  The same -- similar purpose as the Cambria trip.  It was

2   for more further training and planning for operations.

3   Q.  And where did that take place in Michigan?

4   A.  It was in Luther, Michigan, at Ty Garbin's property.

5   Q.  Okay.  And Ty Garbin is one of the other indicted

6   defendants?

7   A.  That's correct.

8   Q.  Did they also set up a kill house to train on that land?

9   A.  Yes, they did.

10  Q.  Okay.  Did Mr. Croft bring an improvised explosive device

11  to that meeting?

12  A.  Yes, he did.

13  Q.  And how did it differ from the one that he used in

14  Wisconsin?

15  A.  The first one in Wisconsin didn't necessarily detonate the

16  way it was supposed to.  The second one in Luther, they had set

17  up silhouettes of personnel or personnel-looking silhouettes

18  around the area, detonated it with shrapnel, and assessed where

19  that shrapnel hit those silhouettes.

20  Q.  And FBI actually executed a search at Ty Garbin's property

21  in Luther back on October 7th, correct?

22  A.  That's correct.

23  Q.  And you actually saw the remnants of that explosion?

24  A.  Yes, sir.

25  Q.  So you actually were able to see the human silhouette

1   targets around that bomb?

2   *A.*   That's correct.

3   *Q.*   Did it also use -- incorporate shrapnel to harm human

4   beings?

5   *A.*   That's correct.

6   *Q.*   And you mentioned that this one actually did detonate.  Did

7   the FBI go and interview people who lived in the area?

8   *A.*   They did.

9   *Q.*   What did those folks say?

10  *A.*   Neighbors had heard an explosion-type noise but they did

11  not report it at the time.

12  *Q.*   Okay.  Now, at this training in Luther, Michigan, did they

13  also discuss the plan to kidnap Governor Whitmer?

14  *A.*   Yes, they did.

15  *Q.*   All right.  And you've listened to recordings from that as

16  well, correct?

17  *A.*   Yes, I have.

18  *Q.*   And Mr. Croft is on those?

19  *A.*   Yes.

20  *Q.*   They are very, very quiet, right?  I'm not going to try and

21  do these ones here, but you've had a chance to listen to them?

22  *A.*   Yes, that's correct.

23  *Q.*   All right.  I just want -- there's quite a few -- there's

24  hours of it, but I just want to focus on a couple of key

25  things.

1      Well, first before we even talk about that, did they talk

2    about going to do a nighttime surveillance of the governor's

3    house?

4    *A.*  Yes, they did.

5    *Q.*  And we've talked about this at the preliminary examination,

6    but just to focus on Mr. Croft, did he participate in that

7    surveillance?

8    *A.*  Yes, he did.

9    *Q.*  And he was in one of the three cars that went up to check

10   out her house at night, correct?

11   *A.*  That's correct.

12   *Q.*  All right.  And who else was in the car with him?

13   *A.*  Adam Fox and an individual working with the FBI.

14   *Q.*  So that was an undercover FBI agent?  I'm sorry about the

15   confusion, Your Honor.

16           *MR. BLANCHARD:*  I'm sorry, I just couldn't hear that

17   last name.

18           *THE WITNESS:*  An undercover agent for the FBI.

19   *Q.*  *(BY MR. KESSLER)*  Now, before they went up there and

20   before they met in Luther they had discussed taking down a

21   bridge, correct?

22   *A.*  That's correct.

23   *Q.*  All right.  And what would be the purpose of taking down

24   the bridge near the governor's vacation home?

25   *A.*  It was meant to slow law enforcement response to the

1   residence.

2   Q.  All right.  And Mr. Croft was, you mentioned, in a car with

3   Adam Fox and an FBI agent.  And what was the FBI -- what had

4   the FBI agent been introduced as to this group?

5   A.  He was an explosive expert.

6   Q.  All right.  So the three of them went up there.  And did

7   they do anything on the way up to the governor's house?

8   A.  They stopped at one of the bridges that led to the

9   governor's residence and actually went under the bridge to

10  assess where they could put explosives to take down that

11  bridge.

12  Q.  Okay.  Let me bring up Exhibit 8 for identification.  This

13  is the only one that we saw last time as well.

14      So this is part of an encrypted chat that was -- that all

15  the conspirators were on, correct?

16  A.  That's correct.

17  Q.  All right.  Well, maybe not all.  I'm not sure if Mr. Croft

18  was on it.  But it said -- the name of the person at the top,

19  it says "Alpha Fuck You."  Who is that?

20  A.  That's Adam Fox.

21  Q.  Okay.  And what is this photograph that he's sending to the

22  rest of the group?

23  A.  That is a photograph from under the bridge where the

24  support beams for the bridge itself are.

25  Q.  Okay.  And Mr. Croft was with them when they stopped to go

1  look under there?

2  *A.*  That's correct.

3  *Q.*  And the purpose of it was to look under there to do what?

4  *A.*  To determine placement of explosives to take down that

5  bridge.

6  *Q.*  Now, while they were on the way up there did Mr. Croft say

7  anything to the other people in the car about needing to take a

8  nap?

9  *A.*  Yes, Mr. Croft referenced taking a nap with believing that

10  he needed to be ready for later, referencing later in the

11  evening.

12  *Q.*  And based on what he told the undercover agent and

13  Adam Fox, what did he think he needed to be ready for?

14  *A.*  Mr. Croft believed that they were actually doing the actual

15  operational action that evening or that night of kidnapping the

16  governor or taking her residence.

17  *Q.*  So he was ready to take her that night?

18  *A.*  That's correct.

19  *Q.*  All right.  Who, if anybody, had to talk him down?

20  *A.*  At the time Adam Fox was -- we were reported that Adam Fox

21  had to talk him down and explain that they weren't doing it or

22  they weren't ready tonight.

23         *MR. KESSLER:*  All right.  I offer Exhibit 8 into

24  evidence, Your Honor.

25         *THE COURT:*  Any objection?

*DIRECT EXAMINATION OF RICHARD J. TRASK, II*                33

1          *MR. BLANCHARD:*  Yeah, I don't see the relevance.   They

2     have not established that my client has ever seen this, was a

3     party to it.   I think the testimony was he probably wasn't.

4     And so I'm not sure what the relevance is.

5          *THE COURT:*  Well, it appears the relevance is just the

6     picture of the bridge and it's corroboration of the other

7     testimony.   It's a detention hearing, the Rules of Evidence

8     don't actually apply, so I'm going to overrule the objection

9     and admit Exhibit 8.

10         *MR. KESSLER:*  And I'll just clarify that for the

11    record, Your Honor.

12    *Q.   (BY MR. KESSLER)*  Let's just make sure we understand where

13    this came from.   So you testified that Barry Croft and Adam Fox

14    stopped at a bridge on the way up to the governor's house to

15    look for a place to plant explosives, correct?

16    *A.*   That's correct.

17    *Q.*   And then Adam Fox sent a picture of what they were looking

18    at to the other members of the conspiracy?

19    *A.*   That's correct.

20    *Q.*   And that's this picture?

21    *A.*   That's correct.

22    *Q.*   Okay.

23         *THE COURT:*  And, Mr. Blanchard, I do note that the

24    special agent did testify that he did not believe Mr. Croft was

25    on this text message exchange.

1          *MR. KESSLER:*  Correct.  Correct.

2   *Q.  (BY MR. KESSLER)*  All right.  So afterwards we were just

3   talking about the fact that they had some conversations about

4   what their plans were when they got back.  The ones that were

5   very quiet.

6   *A.*  That's correct.

7   *Q.*  So did they ever talk about Governor Whitmer having a

8   security detail that they would need to deal with?

9   *A.*  Yes, they did.

10  *Q.*  What was the nature of that discussion?

11  *A.*  Dealing with how many they would have to deal with

12  potentially on her detail and then further discussing if the

13  presidency had changed hands and Biden became -- came in

14  office, Governor Whitmer had a chance of potentially being on a

15  cabinet.  At that point her detail could increase substantially

16  and would be a harder target.

17  *Q.*  So they talked about her getting upgraded to Secret Service

18  protection or something like that?

19  *A.*  That's correct.

20  *Q.*  Okay.  Did these individuals, including Mr. Croft,

21  specifically talk about what they expected to face with the

22  Secret Service detail?

23  *A.*  Yes, they did.

24  *Q.*  So you heard Ty Garbin talking about what would happen

25  if -- what he's seen working at the airport when protectees

1  would come into the airport, correct?

2  A.  That's correct.

3  Q.  And then after that did Mr. Croft talk about seeing

4  Secret Service details on the road as a truck driver?

5  A.  Yes, Mr. Croft explained that he was a truck driver and he

6  had passed numerous Secret Service details and then went on to

7  describe a scenario where he had purposefully run some off the

8  road with the excuse of "I didn't see it" or whatnot while he

9  was driving.

10  Q.  And we don't know if that actually happened or if he was

11  just bragging, but he said it?

12  A.  That's correct.

13  Q.  Okay.  Did Mr. Croft specifically talk about how many

14  people he had seen in each car that they would need to be ready

15  for?

16  A.  I don't recall that off the top of my head.

17  Q.  Okay.  He talked a little bit about what he had seen and

18  expected to find with them, correct?

19  A.  That's correct.

20  Q.  So what did he say they would need to do in order to

21  distract or stop the governor's security detail?

22  A.  So they understood that they would need to end up killing

23  them or at that point they would need to disable vehicles or

24  plant explosives to delay the response.

25  Q.  Did he talk about using IEDs against them?

*DIRECT EXAMINATION OF RICHARD J. TRASK, II*      36

1   A.  He did.

2   Q.  Did he talk about using incendiaries against them?

3   A.  Yes, he did.

4   Q.  And at one point did he talk about wanting to use a

5   particular weapon against the convoy?

6   A.  Yeah, he mentioned a 37, which would be used -- it's an

7   undermount launcher that would be used to essentially take out

8   the lead vehicle to slow the response.

9   Q.  Okay.  Now, when he says a 37, I'm going to -- first off, I

10  think we already did Exhibit 8.

11      Let me bring up Exhibit 9.  Let me see if I can turn this

12  in the right direction.  There we go.

13      Okay.  Is this the rifle that we saw Mr. Croft using during

14  the training in Cambria, Wisconsin?

15  A.  Yes.

16  Q.  All right.  And you mentioned that a 37 would be referring

17  to an undermount launcher.  Can you see the little arrow here?

18  Is that what we're talking about here?

19  A.  Yes, it is.

20  Q.  What is that?

21  A.  That is a 37-millimeter undermount launcher.

22  Q.  That's a projectile launcher?

23  A.  Yes.

24  Q.  He talk about in the recording putting it on the lead

25  vehicle, so this would be something they would launch at the

1    governor's protection detail?

2    *A.*   That's correct.

3    *Q.*   Did he say in the recording that's why he had left this

4    with the group?

5    *A.*   Yeah, he gave it to the CHS and left it with him to train

6    on and get used to.

7    *Q.*   I just want to point out a couple other features of this

8    gun.   What's this I'm focusing on here at the end of the

9    barrel?

10   *A.*   It's a silencer.

11   *Q.*   Is it legal to possess a silencer without registering it

12   with the ATF?

13   *A.*   Not without registration, no.

14   *Q.*   And this gun is at ATF right now for official examination,

15   correct?

16   *A.*   That's correct.

17   *Q.*   And it appears to be a fairly short weapon.   Is it also

18   illegal to possess a short-barreled rifle without registration?

19   *A.*   That is correct.

20   *Q.*   Are you aware of Mr. Croft having this gun or the silencer

21   registered anywhere?

22   *A.*   I have not seen any paperwork that suggests he's registered

23   either.

24         *MR. KESSLER:*   Okay.   I have nothing further,

25   Your Honor.

CROSS-EXAMINATION OF RICHARD J. TRASK, II                    38

1              THE COURT:  All right.  Mr. Blanchard.

2              MR. BLANCHARD:  Thank you, Your Honor.

3              MR. KESSLER:  I'll offer Exhibit 9 into evidence

4   Your Honor.

5              THE COURT:  Any objection?

6              MR. BLANCHARD:  No, Your Honor.

7              THE COURT:  It's admitted.

8                        CROSS-EXAMINATION

9   BY MR. BLANCHARD:

10  Q.  Good afternoon.

11  A.  Good afternoon.

12  Q.  So I understand there was an event in Dublin, Ohio,

13  correct?

14  A.  That's correct.

15  Q.  And that was an event where people got together, right?

16  A.  Correct.

17  Q.  From multiple states?

18  A.  Yes.

19  Q.  To talk?

20  A.  Correct.

21  Q.  Without government?

22  A.  Correct.

23  Q.  And they wanted to, you know, follow the Bill of Rights,

24  correct?

25  A.  I'm not understanding your question.

1    Q.  They expressed that they wanted a government that would

2    follow the Bill of Rights.  That was one of their topics,

3    right?

4    A.  That was, yes.

5    Q.  And there were more than six people at this meeting, right?

6    A.  Correct.

7    Q.  There were people from a dozen or more states, right?

8    A.  I don't know about if it was a dozen or more, but there

9    were several states, yes.

10   Q.  How many people were at the meeting?

11   A.  I don't have the exact number offhand.

12   Q.  Were there more than 10?

13   A.  I believe so, but, again, I don't know the exact number.

14   Q.  And this meeting was attended by a person from Wisconsin,

15   correct?

16   A.  That's correct.

17   Q.  And it was attended by confidential human sources, correct?

18   A.  Correct.

19   Q.  There were no undercover agents at this meeting?

20   A.  No, there were not.

21   Q.  Okay.  In fact, this meeting in Dublin was organized by a

22   person from Wisconsin, correct?

23   A.  I'm not sure offhand who organized the exact meeting.

24   Q.  They rented a hotel room?

25   A.  There were hotel rooms rented, yes.

1    *Q.*  And there was a conference room rented, correct?

2    *A.*  I'm not sure on that.

3    *Q.*  Okay.  Do you know who paid for the conference room in

4    Dublin, Ohio?

5    *A.*  I do not.

6    *Q.*  Or the hotel in Dublin, Ohio?

7    *A.*  I do not.

8    *Q.*  Okay.  Do you know if a confidential source rented any

9    rooms in Ohio?

10        *MR. KESSLER:*  I don't mean to just be jumping up for

11   no reason, Your Honor, but this seems to be just a discovery

12   mission here.  I don't know what who paid for the hotel would

13   have to do with whether or not he's a flight risk or a risk of

14   danger to the community.

15        *MR. BLANCHARD:*  So I think the picture it paints here,

16   I think that the government is funding this meeting and

17   inviting people into this meeting where they are then saying

18   "Well, people talked about things."  But the government is the

19   driving force behind it.  So when we talk about -- I think

20   that's relevant to the weight of the evidence, right?  And

21   that's a relevant bond consideration.

22        *THE COURT:*  We haven't yet elicited any evidence that

23   the government did fund anything, so I'll give you a little bit

24   of latitude here.

25        *MR. BLANCHARD:*  Thank you.

CROSS-EXAMINATION OF RICHARD J. TRASK, II          41

1          THE COURT:  But I'd ask you to keep it, you know --

2          MR. BLANCHARD:  Thank you.

3  Q.  (BY MR. BLANCHARD)  You're familiar with someone named

4  Confidential Human Source 1, correct?

5  A.  Yes.

6  Q.  And that person is referenced in the Criminal Complaint,

7  correct?

8  A.  That's correct.

9  Q.  And that person is from Wisconsin, correct?

10  A.  I would have to look at the numbers.  I have not looked at

11  the Complaint.

12  Q.  Steve Robeson is a confidential human source, correct?

13          MR. KESSLER:  Your Honor, totally not relevant.

14          MR. BLANCHARD:  Well, I think Steve Robeson is at this

15  meeting, and based on my piecing together of the discovery,

16  he's the person who is driving this and inviting people and

17  funding it.  And I think if I'm right by piecing the discovery

18  together -- because they, you know, don't make it particularly

19  clear -- they paid him quite a lot of money.  And they noted

20  that in the Criminal Complaint.  Whoever CHS-1 is, I believe.

21          THE COURT:  I don't believe identification is

22  necessary to your argument today --

23          MR. BLANCHARD:  Very well.

24          THE COURT:  -- and so I think it's enough to say he's

25  a confidential human source.

*CROSS-EXAMINATION OF RICHARD J. TRASK, II*            42

1    Q.   (BY MR. BLANCHARD)   So Confidential Human Source 1 is

2    somebody who is paid money by the FBI, correct?

3    A.   There was funds paid, yes.

4    Q.   And that person was present at the Dublin meeting, correct?

5    A.   I believe that is the case, yes.

6    Q.   And that person invited people to the Dublin meeting,

7    correct?

8    A.   I'm not sure who did all the inviting.

9    Q.   But you do know that CHS-1 invited Mr. Croft to the

10   meeting, correct?

11   A.   I'm not aware of that.

12   Q.   Who is responsible for handling CHS-1?

13   A.   It would be agents in Wisconsin.

14   Q.   Are you aware whether CHS-1 paid for Mr. Croft's hotel

15   room?

16   A.   Again, I'm not aware if he paid for the hotel rooms.

17   Q.   So there's this meeting in Dublin, Ohio, where there's just

18   talk that goes on, right?

19   A.   There was conversation, yes.

20   Q.   There was no training.  There were no weapons exercises.

21   Nothing like that, right?

22   A.   That's correct.

23   Q.   And you said at the end of that people went back to their

24   home states, correct?

25   A.   That's correct.

1   Q.  And I think you said the intent was that people would

2   recruit from their home states.  True?

3   A.  That's correct.

4   Q.  Mr. Croft didn't bring anyone into this group from

5   Delaware, correct?

6   A.  Not that I'm aware of.

7   Q.  And Delaware is his home state, right?

8   A.  That is correct.

9   Q.  The next meeting of people that Mr. Croft was at was in

10  Cambria, Wisconsin?

11  A.  I would have to look at the timeline.  I just can't recall

12  if he was involved in that meeting.

13  Q.  You're not aware of any other meetings until Cambria; is

14  that fair?

15  A.  At this time, no.

16  Q.  Okay.  And that was a what you've called an FTX or field

17  training exercise, correct?

18  A.  Correct.

19  Q.  Where they exercise with weapons and train with weapons,

20  correct?

21  A.  Correct.

22  Q.  It's not criminal, right?

23  A.  No, it's not.

24  Q.  And there were more than the people charged in this case

25  present, correct?

1   A.   That is correct.

2   Q.   People brought their families to this event, correct?

3   A.   Correct.

4   Q.   You're not suggesting it's criminal to be at that FTX,

5   correct?

6   A.   I am not.

7   Q.   And that FTX was set up by someone who lives in Wisconsin?

8   A.   That's correct.

9   Q.   Who is a confidential human source?

10  A.   Who was a confidential human source, yes.

11  Q.   Okay.  So the July 11 and 12 FTX was set up by someone

12  working for the government, correct?

13  A.   That's correct.

14  Q.   And there was funding that was necessary to pull that off,

15  right?

16  A.   I'm not -- I could not speculate on the funding.

17  Q.   So you don't know whether the CHS paid money to make that

18  FTX happen?

19  A.   I don't know if that was stuff on his property or if it

20  was -- there was stuff that had to be done.

21  Q.   You talked about what you called an improvised explosive

22  device at the Cambria FTX, right?

23  A.   That's correct.

24  Q.   Now, what that was was black powder, right?

25  A.   Amongst other items, yes.

1   Q.   That was put in a container, right?

2   A.   Correct.

3   Q.   And it didn't go off?

4   A.   It just produced some smoke as opposed to exploding, yes.

5   Q.   Okay.  So there was no explosion from this --

6   A.   That's correct.

7   Q.   -- IED of sorts?

8   A.   That's correct.

9   Q.   Okay.  So it wasn't an explosive device, it was a smoking

10  device?

11  A.   The failure to explode does not make it any less of an

12  explosive device.

13  Q.   But to be clear, it didn't explode, right?

14  A.   It did not explode.

15  Q.   Okay.  Now I want to direct your attention to -- you heard

16  Exhibit 7 being played?

17  A.   Yes.

18  Q.   And it's a discussion between Mr. Croft and -- it's an

19  excerpt of a discussion between Mr. Croft and some man,

20  correct?

21  A.   That's correct.

22  Q.   Is the man he's talking to -- do you know the identity of

23  that person?

24  A.   I am aware, yes.

25  Q.   Who is that person?

1          MR. KESSLER:  Again, objection, Your Honor.  That

2     person doesn't even say anything other than, "Um, yeah."  I

3     just didn't want to have -- have the transcript not reflect

4     reality.  But there's nothing relevant about that person's

5     identity.

6          MR. BLANCHARD:  He doesn't say anything in the excerpt

7     that's presented here, but I think if it's a government

8     employee that is pushing him and pressing him, it's different.

9          THE COURT:  You can ask him whether or not that person

10    worked for the government, but I don't think it's appropriate

11    at this point to identify the person.

12         MR. BLANCHARD:  I was expecting an answer like CHS-1

13    or something along that line.

14         THE COURT:  That's fine.

15         MR. BLANCHARD:  If he knows --

16         THE COURT:  I believe Mr. Kessler's objection was --

17    unless I misunderstand Mr. Kessler's objection -- would be

18    identification of the witness.

19         MR. BLANCHARD:  Yeah, he said he had a pseudonym.  I'm

20    sorry.

21    Q.   (BY MR. BLANCHARD)  Do you know was that a confidential

22    human source?

23    A.   Yes, it was.

24    Q.   Which one?

25    A.   I believe it was 1 if I recall correctly.

CROSS-EXAMINATION OF RICHARD J. TRASK, II                    47

1   Q.  So you're thinking it was the guy from Wisconsin?

2   A.  That's correct.

3   Q.  And what was the date of this phone call?

4   A.  This was, I believe -- if I recall correctly, it was during

5   the Cambria event.

6   Q.  So it was with the guy from Wisconsin while they were in

7   Wisconsin?

8   A.  Yes.

9   Q.  I want to turn your attention to what I think you called

10  the Luther field training exercise.  That was an event in

11  Michigan, correct?

12  A.  That's correct.

13  Q.  Where you say Mr. Croft was present?

14  A.  That's correct.

15  Q.  And you talked about an IED, right?

16  A.  That's correct.

17  Q.  What you're talking about is a firework, correct?

18  A.  No.  An IED is not a firework.  There is a distinct

19  difference.

20  Q.  It was a firework that was modified?

21  A.  That's correct.

22  Q.  Okay.  And you said you talked to some neighbors who said

23  they had heard an explosion, right?

24  A.  That's correct.

25  Q.  And this was around September 12th, correct?

1   A.  Over that weekend, yes.

2   Q.  The 11th or 12th; is that right?

3   A.  12th or 13th if I recall correctly.

4   Q.  There were other things blown up that weekend, correct?

5   A.  I'm not aware of other things that were blown up.

6   Q.  Are you aware of anyone demonstrating explosives that

7   weekend?

8   A.  Aside from the explosive that Mr. Croft demonstrated, no.

9   Q.  Yeah.  Are you aware of a Chevrolet Suburban SUV that

10  somebody was demonstrating explosions within?

11  A.  At the event?

12  Q.  That weekend.

13  A.  I'm not aware of that.

14  Q.  Okay.  Do you know where Red was that weekend?

15  A.  Red, I believe, was up there at some point during the

16  weekend.

17  Q.  And Red was an undercover FBI agent, correct?

18  A.  That's correct.

19  Q.  And so you're saying as far as you know there were no other

20  explosions the weekend of September 11th and 12th?

21  A.  There were not.

22  Q.  And so you don't have any reports from Red saying he

23  observed someone demonstrating det cord?

24  A.  I am not aware of anything.  Any reports.

25  Q.  And it's that weekend that you say there was a trip up

1   to -- near the governor's lake house, correct?

2   A.   That's correct.

3   Q.   And this is the surveillance you talked about, right?

4   A.   That's correct.

5   Q.   Occurred at the nighttime?

6   A.   Correct.

7   Q.   Okay.   And there were two cars that drove up there; is that

8   right?

9   A.   Three cars total.

10  Q.   Three cars.   And you said Mr. Croft was in a car that had

11  Mr. Fox in it, correct?

12  A.   That's correct.

13  Q.   Also had Red in it, correct?

14  A.   That's correct.

15  Q.   And it had CHS-1 in it?

16  A.   No.

17  Q.   Who else was in that car?

18  A.   It was just them.   The three.

19  Q.   You're saying there were only three people in that car?

20  A.   My understanding is, yes, there were only those three.

21  Q.   Who drove that vehicle?

22  A.   I don't recall offhand.

23  Q.   Which vehicle was Mr. Croft in?   What kind of vehicle was

24  it?

25  A.   I don't have that information.   I'm sorry.

1         MR. KESSLER:  Again, I don't understand what the

2  relevance of any of this is to detention other than just trying

3  to create a transcript he can use to cross-examine the witness

4  later or something.  That's kind of a waste of everybody's

5  time.

6         THE COURT:  Can you clarify that, Mr. Blanchard?

7         MR. BLANCHARD:  Again, I'll ask some more questions,

8  but it's about, you know, the government is driving this,

9  right?  And so that's why I was asking who drove.

10  Q.   (BY MR. BLANCHARD)  Was Red?  Do you know was Red driving?

11  A.   I can't speculate at this time.  I don't remember.

12  Q.   So we talked about Confidential Human Source 1 organized

13  the Cambria event.  Who organized the Luther event?

14  A.   That would have been a combination of individuals, but it

15  was Ty Garbin's property.

16  Q.   It was Ty Garbin's property, and who invited Mr. Croft?

17  A.   I don't know who specifically invited Mr. Croft.

18  Q.   How was Mr. Croft invited?

19  A.   Again, I don't know specifically how Mr. Croft was invited

20  or who invited him.

21  Q.   Well, you guys were recording phone calls, right?

22  A.   That's correct.

23  Q.   You were doing surveillance on these people, right?

24  A.   That's correct.

25  Q.   And you're saying you just don't have any idea how it was

1   that Mr. Croft was invited?

2   A.  There are thousands of hours of audio and video that we are

3   going through.  I have not reviewed every single audio and

4   video piece that is out there.

5   Q.  I would like to turn your attention to what's been marked I

6   think --

7               MR. BLANCHARD:  I don't know, did 9 come?

8               THE COURT:  It did.

9               MR. BLANCHARD:  Okay.  Thank you.

10  Q.  (BY MR. BLANCHARD)  It's been marked as

11  Government's Exhibit 9.  Has this already been analyzed by an

12  ATF agent?

13  A.  It is at ATF currently.

14  Q.  So you're saying they haven't looked at it to see if it's

15  legal?

16  A.  They have to make that determination.  It's not our

17  organization's policy to make that determination.  So it is

18  with them currently.

19  Q.  Yeah, I'm sorry, I think the mask impeded my question

20  there.

21      My question is have they made that determination yet?

22  A.  It is at ATF to make that determination.  We are awaiting

23  that determination.

24  Q.  So are you saying they have not yet made that

25  determination?

1   A.  That is what I've said now three times.

2   Q.  I don't know that it is.  So you're saying the

3   determination has not yet been made?

4   A.  It is at ATF to make that determination.  We have not

5   received that determination yet.

6   Q.  So you don't have any evidence that the firearm in

7   Exhibit 9 is illegal then, correct?

8   A.  Not until ATF responds back with that determination.

9   Q.  Okay.  And then that item that's under the barrel,

10  that's -- I think you testified it's called a 37, right?

11  A.  37 millimeter, yes.

12  Q.  And those have legal purposes, right?

13  A.  They are legal to have, yes.

14  Q.  You can launch smoke grenades, right?

15  A.  That's correct.

16  Q.  When you're out playing with your guns, right?

17  A.  If you choose to, yes.

18  Q.  And it's not a criminal offense to possess a smoke grenade

19  launcher, correct?

20  A.  Not that I'm aware of.

21  Q.  Am I correct that the last event that Mr. Croft met up with

22  these people was the Luther event in September?

23  A.  That is correct.

24  Q.  So the last information you have of him seeing any of these

25  people in person was September 13 of 2020?

1    A.  In person, yes.

2    Q.  Okay.  And as far as you know he's not been back to the

3    district since then, correct?

4    A.  Not that I'm aware.

5    Q.  And he was not a part of these encrypted wire chat

6    conversations, correct?

7    A.  I would have to go back and review, but I don't believe so.

8    Q.  Okay.  And he wasn't part of the Threema chats, correct?

9    A.  Not that I'm aware of.

10   Q.  You don't have any chats between him and these other

11   gentlemen that are charged, correct?

12   A.  That's incorrect.  There are -- as we go through search

13   warrant stuff, there are messages and communications that are

14   coming up that are being reviewed.

15   Q.  Now, you have undercover agents speak to Mr. Croft on the

16   phone after September 13th, correct?

17   A.  I believe so, yes.

18   Q.  And you've listened to some of those recordings, right?

19   A.  I have not.

20   Q.  Have you read summaries of those recordings?

21   A.  I have not.  Unfortunately, I had some time off due to

22   COVID quarantine, so I was not able to access some of that

23   information.

24   Q.  Now, there had been, I believe, testimony at the

25   preliminary hearings in the other cases about some of the

1  codefendants meeting up at the Vac Shack in Grand Rapids,

2  right?

3  A.  That's correct.

4  Q.  Mr. Croft wasn't present for any of that, right?

5  A.  Not that I'm aware of.

6       MR. BLANCHARD:  One moment, Your Honor.

7       I'll pass the witness Your Honor.

8       THE COURT:  All right.  Any redirect?

9       MR. KESSLER:  Just very briefly.

10                    REDIRECT EXAMINATION

11  BY MR. KESSLER:

12  Q.  Agent Trask, you heard -- you were asked some questions

13  about whether the government paid for travel or hotel rooms,

14  et cetera.  Are you aware of anybody working for the government

15  making this defendant say he wanted to kill people?

16  A.  I am not.

17  Q.  Are you aware of anybody from the government making this

18  defendant say he wanted to snatch Governor Whitmer?

19  A.  I am not.

20  Q.  And are you aware of anybody making him bring a bomb and

21  set it off in Luther?

22  A.  I am not.

23       MR. KESSLER:  I have nothing further, Your Honor.

24       THE COURT:  Anything further, Mr. Blanchard?

25       MR. BLANCHARD:  No, Your Honor.  Thank you.

1          THE COURT:  Any further proofs, Mr. Kessler?

2          MR. KESSLER:  No, Your Honor.

3          THE COURT:  Special Agent Trask, you may step down.

4          THE WITNESS:  Thank you.

5          MR. KESSLER:  Nothing further, Your Honor.

6          THE COURT:  All right.  Mr. Blanchard, anything from

7   your side?

8          MR. BLANCHARD:  No, I don't have any testimony.  Just

9   by way of proffer I would say that Mr. Croft was a resident of

10  Delaware, has been for a long time.  He was gainfully employed

11  when he was arrested.  In fact, he was working when he was

12  arrested.  I mean, I think the Court is aware of the Pretrial

13  Services Report.  He has an old criminal history.

14         THE COURT:  The Pretrial Services Report is certainly

15  in evidence.

16         MR. BLANCHARD:  Yeah.  And so he has an old criminal

17  history, but he has been compliant recently.  The District of

18  Delaware referenced these failures to appear.  And I think the

19  age and the fact that they were for payment largely I don't

20  think carry much weight here, and so I would just incorporate

21  those by proffer.  And I'm happy to argue whenever the Court

22  wants.

23         THE COURT:  All right, Mr. Kessler, I'll let you argue

24  first since you have the burden.

25         MR. KESSLER:  Are you ready for argument from me,

1    Your Honor?  I'm sorry.

2             *THE COURT:*  Yes.  Yes.

3             *MR. KESSLER:*  Yeah.  You know, as far as the old

4    criminal history, I understand some of it was -- is old.  Not

5    all of it is.  And whether he's cleared up his bench

6    warrants -- I noticed they use the word capias, which I guess

7    they use in some other states -- but whether he's cleared up

8    some bench warrants doesn't change the fact that he had seven

9    bench warrants out for him.  He has a citation for civil

10   contempt of court.  An outstanding probation violation for a

11   marijuana conviction.  Again, the marijuana is not a big deal.

12   It's this history of not doing what the court tells him, and

13   he's in here trying to say that he's going to abide by the

14   Court's orders.  I think that goes to whether he's a flight

15   risk.

16            The biggest thing as to flight risk, though, is the

17   seriousness of the offense.  There is no question that this is

18   a very serious offense here.  We heard him talking about

19   wanting to kill people.  I mean, it -- I've got say that just

20   listening to the evidence we heard here today I'm sure

21   Mr. Croft has in his head that a conviction is very likely in

22   this case, and I'm sure he knows that -- he knows just from

23   being told that life is the maximum sentence, I'm sure he has

24   in his head that a life sentence is very likely for him, which

25   gives him a lot of motivation to flee.  It's not like somebody

1    who, you know, might be looking at probation or a year or two

2    who maybe, you know, can take the risk of doing that time.

3          I think when you put that together with what we heard

4    him saying in his recordings, we know that his attitude is not

5    to just go down and take the sentence. He said on that -- on

6    one of those recordings from Dublin, "I have very little time

7    left before they scoop me up, and I don't intend to go out like

8    that. You can tell my boss that I'm not coming back and he can

9    have a funeral for me." Which I think tells you that if he's

10   released, he is not showing up for court. He would plan to

11   just keep running because that's what he's said.

12         As far as danger, I think it's pretty clear from what

13   the Court has heard, both as to the other defendants and what

14   we've heard here, this is probably the most committed violent

15   extremist of the entire group. He's -- they all were committed

16   to doing the offense, but this is the one who has the

17   Three Percenters logo tattooed on his hand, who has held

18   himself out as a national leader of the Three Percenters group.

19   There is no question that this is a person who is committed to

20   violent extremism and he's the one who brought the bombs. I

21   think that's the biggest point of all of it. You know, of all

22   the people who got together here, this is the guy who always

23   put together the bombs and tried to blow them up and he was

24   successful. And these were not fireworks as counsel was

25   talking about. It might have started that way. But you put

1    shrapnel on a piece of fireworks and surround it with human

2    silhouette targets because you want to see how effectively you

3    can kill people.  And he said that in the recording, that he

4    wanted to kill people and he would do it if necessary.  So I

5    think given his own words and all the other evidence we've

6    heard, there is no way we could let him out on bond,

7    Your Honor.

8            *THE COURT:*  Mr. Blanchard.

9            *MR. BLANCHARD:*  Thank you, Your Honor.  As best as I

10   can tell this isn't a presumption case, and so I think the

11   presumption is that my client is innocent and so we need to

12   look at the factors.  And I think there are conditions or

13   combination of conditions that can both assure Mr. Croft's

14   appearance and the safety of the public.  You put him on a GPS

15   tether and put him in a halfway house.

16           He -- the -- you know, the capias we talk about, they

17   are from nonpayment of fines.  I think there's one for failing

18   to appear, but he's there the next day and the judge there, as

19   I recall, fines him and that's it.  And so it's -- these aren't

20   like he's got a history of running.

21           And we have the statements they attribute over in

22   Dublin.  I mean, it's big talk for sure, but everyone at that

23   event was talking big and there was no action taken.  And there

24   weren't people at that group -- they weren't making a specific

25   plan.  They weren't talking about specifics.  And there largely

1    were people from this group.   They were people generally airing

2    grievances.   I don't think that's enough when you consider the

3    presumption of innocence that I think is baked into the Bail

4    Reform Act.   And the fact that this isn't a presumption case, I

5    think he ought to be released on conditions.

6         THE COURT:  You have the burden, Mr. Kessler.   Any

7    rebuttal?

8         MR. KESSLER:  No, just that it wasn't just big talk

9    about being disgruntled with the government.   I think -- I

10   won't belabor the point, but he said he wanted to snatch the

11   governor and he was willing to kill people to do it.   That goes

12   beyond saying "I'm unhappy with the government."

13        THE COURT:  All right.   Thank you to both attorneys.

14   This matter is governed by the Bail Reform Act of 1984, and

15   under the Bail Reform Act I have to release the defendant on

16   bond unless I find either by a preponderance of the evidence

17   that you are a risk of flight or nonappearance or by clear and

18   convincing evidence that you are a danger to the community.   I

19   am required to consider the least-restrictive condition or

20   combination of conditions that will reasonably assure the

21   defendant's appearance and protect the community, and I have

22   considered each of the possible conditions set out in the

23   statute, including those mentioned by counsel which are the GPS

24   tether and halfway house placement.

25        This is not to my knowledge a presumption case.   In

 1    determining whether there are sufficient conditions to

 2    reasonably assure your appearance and to protect the community

 3    I am required to consider a number of factors.  Those include

 4    the nature and circumstances of the offense charged.  They

 5    include whether it's a crime of violence.  It's not -- I don't

 6    know actually whether or not technically under which definition

 7    of crime of violence, one of the many crime of violence

 8    definitions that are found within the United States Code,

 9    whether or not this is a crime of violence under some specific

10    definition.  Certainly a conspiracy to commit kidnapping is a

11    potentially violent offense.

12         I'm also required to consider the weight of the

13    evidence.  The Sixth Circuit has held that that is the weight

14    of the evidence of dangerousness not of the actual offense that

15    is charged.  And, of course, you are cloaked in the presumption

16    of innocence as to the offense charged.  However, in this case

17    the weight of the evidence related to dangerousness overlaps

18    essentially a hundred percent with the weight of the evidence

19    of the offense charged.

20         I'm also to consider the history and characteristics

21    of the defendant and the nature and seriousness of the danger

22    to any person or the community that would be posed by

23    Mr. Croft's release.

24         Here we have a 45-year-old man.  Before he was

25    arrested he had a stable residence and stable employment in

1    Delaware.  He has, as I understand it, three minor children who

2    lived with him at the time.  He stated he does not have a

3    passport, has never traveled outside the United States.  He has

4    at least a high school diploma and possibly some community

5    college or trade school coursework.  Good physical health.  No

6    documentation of a mental health condition.

7           As to substance abuse, he admitted to being a regular

8    marijuana user but no recent use of any other controlled

9    substance.  He did deny to the Pretrial Services officer

10   membership in a militia group, which appears to be controverted

11   by some of the evidence that was introduced today.

12          That brings us to his criminal history.  He has 15

13   arrests, which is a substantial number, of course, but only two

14   of those occurred within the last 10 years.  Some of the older

15   criminal convictions are serious, including multiple counts of

16   receiving stolen property, an assault charge, multiple counts

17   of burglary, possession of a firearm during the commission of a

18   felony.  That last offense involved reports of Mr. Croft firing

19   either a handgun or a pellet gun at another person.

20          In April of 2019 he appears to have received a pardon

21   for a number of prior offenses.  The reasons for that pardon

22   are not known to the Court, haven't been discussed today.

23          Mr. Kessler is correct that particularly the earlier

24   charges are accompanied by numerous probation violations and

25   failures to appear.  Some of those relate to payment, but some

62

1   of them appear to be simply failures to appear.

2           There are also three civil contempt charges in the

3   record.  Although the most recent of those I believe was 1995.

4   I'm sorry, 2005.  In 2018 he was convicted of being a felon in

5   possession of a firearm.  Later that charge was amended to

6   carrying a concealed deadly weapon.  In 2019 he pled guilty to

7   a drug paraphernalia charge.  The Pretrial Services Report

8   notes an outstanding probation violation warrant.  The nature

9   of that probation violation is not noted.  It's possible that

10  it's the instant conduct that it relates to, but I don't have

11  any information one way or the other on that.

12          The pretrial services officer in Delaware who assessed

13  Mr. Croft recommended detention both as a risk of nonappearance

14  and as a danger to the community.  Notably that determination,

15  the pretrial services officer's determination, can't consider

16  the nature of the instant offense which is the primary evidence

17  of dangerousness to the community in this case.

18          Mr. Charge is -- Mr. Croft is charged with obviously a

19  very serious offense, conspiring to kidnap the governor of the

20  State of Michigan.  It's alleged that he met with Mr. Fox, a

21  coconspirator, on June 6th in Dublin, Ohio.  There's been

22  testimony regarding the discussion of antigovernment actions

23  including the kidnapping of state governors.  The defense

24  argues that that is simply a matter of big talk.  The

25  recordings, though, that the government has introduced are

1   chilling.  They discuss very violent actions directed toward

2   both targets, people to be kidnapped but also toward law

3   enforcement officers either who protect those individuals or

4   who might respond to a kidnapping.

5          Around July 10 through 12 Mr. Croft is alleged to have

6   traveled from Delaware to Wisconsin to attend a field training

7   exercise with several alleged coconspirators.  At that meeting

8   the group practiced combat tactics, including assaulting motor

9   vehicles with semiautomatic assault rifles and live ammunition.

10  None of that is by itself illegal.  And Mr. Blanchard makes

11  some argument that at least some of this was organized by

12  individuals who ultimately were working for the government.

13  That said, again the statements that Mr. Croft makes in the

14  recordings do not -- are not something that could be attributed

15  to another individual.  Those appear to be statements of his

16  own volition, and as I said, they are chilling.

17         At that field training exercise Mr. Croft attempted to

18  detonate two improvised explosive devices.  It is not clear to

19  the Court exactly how sophisticated those devices are, but what

20  is relevant is that Mr. Croft appears to have been trying to

21  use explosive devices or develop them for the field training

22  exercise on September 12th and 13th.  And it's from that

23  exercise that Mr. Croft is alleged to have participated in the

24  nighttime surveillance of Governor Whitmer's vacation home.

25         On the way to that surveillance, as Special Agent

1    Trask testified, those two individuals are alleged to have

2    stopped to inspect the underside of a highway bridge near that

3    vacation home as a possible location to mount an explosive

4    charge, which again was discussed to be designed to impede law

5    enforcement's response to the kidnapping of the governor.

6           And then on September 13 at that field training

7    exercise there is another improvised explosive device that

8    apparently contained shrapnel.  Again, it's not clear to me

9    what the level of sophistication is of that device.  It may

10   have been a modified firework as was discussed today.  But the

11   fact that Mr. Croft is working toward developing such a device

12   is relevant to the Court's determination of dangerousness.

13          The transcripts provided by the government are not

14   evidence themselves, but they are helpful to the Court just in

15   recalling what was said during the recordings.  I did not note

16   any differences in my perception of the recordings from what

17   was set out in the transcript.  And Mr. Croft says things in

18   these transcripts like "I'm going to hurt people.  I'm going to

19   hurt people real fucking bad."  And "I'm going to burn

20   motherfucking houses down and blow shit up.  I'm going to do

21   some of the most nasty, disgusting things that you have ever

22   read about in the history of your life."  That's from

23   Exhibit 3.  I'm not going to read all of these, but he talks

24   about leveling buildings.  He talks about burning people's

25   houses down with them inside it.  And terrorizing people.  And

1    he talks about specific plans to cause distractions and

2    simultaneously plan other -- plan multiple operations at once

3    or multiple targets at once so that -- to distract law

4    enforcement from his team standing by to grab a fucking

5    governor.  And all of those are relevant to and persuasive to

6    the Court in terms of that being evidence of Mr. Croft's

7    dangerousness to the community.

8            Mr. Kessler makes an argument about the seriousness of

9    the offense being relevant to the risk of flight.  I don't know

10   whether a conviction is likely or what Mr. Croft's sentence

11   will be.  And as I said, Mr. Croft is cloaked in the

12   presumption of innocence.  What is relevant about the

13   seriousness of the offense coupled with the evidence relating

14   to opposition to police officers is that that evidence

15   demonstrates the potential for opposition to law enforcement

16   who would be tasked with Mr. Croft's supervision or potential

17   arrest.

18           So moving on to the two bases that the government has

19   noted for detention.  As to the risk of nonappearance, I would

20   normally give Mr. Croft's history of failure to appear and to

21   comply with court orders limited weight due to their age.

22   Likewise, his residence outside the district while a factor is

23   certainly not dispositive.  He has a stable residence and

24   employment and that favors release.  But as I noted just a

25   minute ago, his history of noncompliance with court orders

1    paired with the seriousness of the offense and its

2    antigovernment nature and his anti-law enforcement rhetoric

3    leads me to find by a preponderance of the evidence that

4    there's no condition or combination of conditions that would

5    secure his appearance as required.

6         Mr. Blanchard argues for a tether and halfway house.

7    Tethers are fairly easily removed, and halfway house placement

8    is not undefeatable.  It is easy to leave the halfway house for

9    the most part.  So I don't believe that those conditions or the

10   combination of them is sufficient.

11        While I believe the government has satisfied its

12   burden on the risk of nonappearance, the Court's primary

13   concern here, though, is the danger to the community.  And I do

14   find by clear and convincing evidence that Mr. Croft is a

15   danger to the community.  That danger is three-fold.  The

16   danger -- the defendant is dangerous because of the cause with

17   which he associated himself.  One might argue that now that the

18   plot against the governor has been foiled there's no further

19   danger, but that one plot has been uncovered does not mean that

20   there are not other aims toward which Mr. Croft would not

21   direct his intentions and his explosives craft.  In other

22   words, just because law enforcement was able to disrupt the

23   alleged plot against the governor does not mean that

24   Mr. Croft's interests in violent overthrow of leaders he views

25   as despotic has ended.  And as I said before, a tether is

1   simply not a sufficient impediment to reasonably assure the

2   safety of the community.  The defendant's release would also

3   pose a specific danger to the witnesses and informants in this

4   case, and I do not believe that an order short of detention

5   would reasonably assure their safety.

6          Finally, the Court notes that the allegations -- as

7   I've said before, the allegations regarding this conspiracy and

8   the evidence introduced today are replete with discussion of

9   violence toward law enforcement officers.  For instance, here

10  the use of a bomb to blow up a bridge was specifically for the

11  purpose of impeding a law enforcement response to the proposed

12  kidnapping.  In addition, the various calls that were

13  recorded -- or not calls -- the various recordings that were

14  made discuss violence toward law enforcement officers.  So all

15  of those facts support the conclusion that there is no

16  condition or combination of conditions that would assure the

17  safety of the community.

18         So I am going to order, Mr. Croft, that you be

19  detained pending the trial in this case.  You will continue to

20  be held in the custody of the United States Marshal Service in

21  Newaygo County, at least for the moment.

22         I'm sure you don't agree with my decision.  Do you

23  understand everything that happened in court today?

24             THE DEFENDANT:  Yes, ma'am.

25             THE COURT:  All right.  Anything else, Counsel, that

1    we need to take up?

2              MR. KESSLER:  No, Your Honor.  Thank you.

3              THE COURT:  Mr. Blanchard?

4              MR. BLANCHARD:  Not today.  Thank you.

5              THE COURT:  All right.  We'll be adjourned.

6              THE CLERK:  All rise, please.  Court is adjourned.

7         (Proceeding adjourned at 5:23 p.m.)

8                           *  *  *  *  *

9                           CERTIFICATE

10        I certify that the foregoing is a transcript from the

11   Liberty Court Recording System digital recording of the

12   proceedings in the above-entitled matter, transcribed to the

13   best of my ability.

14        I further certify that the transcript fees and format

15   comply with those prescribed by the court and the Judicial

16   Conference of the United States.

17

18   February 1, 2021

19

20                           /s/ Glenda Trexler
                              _____
                              Glenda Trexler, CSR-1436, RPR, CRR
21

22

23

24

25

1                          *EXAMINATION INDEX*

2                                                    *PAGE*

3    *RICHARD J. TRASK, II*

4        *DIRECT EXAMINATION BY MR. KESSLER:*          12

5        *CROSS-EXAMINATION BY MR. BLANCHARD:*         38

6        *REDIRECT EXAMINATION BY MR. KESSLER:*        54

7                        *   *   *   *   *

8                          *EXHIBIT INDEX*

9    *EXHIBIT*                              *OFFERED   ADMITTED*

10   *GVT 1      Photograph*                    18        20

11   *GVT 2      Photograph*                    20        20

12   *GVT 3      Audio recording*               21        21

13   *GVT 4      Audio recording*               21        21

14   *GVT 5      Audio recording*               22        22

15   *GVT 6      Video recording*               26        27

16   *GVT 7      Audio recording*               27        27

17   *GVT 8      Portion of an encrypted chat*  32        33

18   *GVT 9      Photograph*                    38        38

19

20

21

22

23

24

25