UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

    Plaintiff,

v.

BARRY GORDON CROFT, JR.,

    Defendant.

_____/

Hon. Robert J. Jonker

Case No. 1:20-cr-183

**OPINION AND ORDER**

This matter is before the Court on the motions of several media outlets for an order requiring that the government release exhibits that were introduced at the bond hearing held for Defendant Barry Croft, Jr., on January 13, 2021. (ECF Nos. 193, 198, and 210.) Defendant Croft filed a response opposing the motions. (ECF No. 205.) The government filed a response in which it did not take a position on the release of the exhibits. (ECF No. 204.) The motions were taken under advisement at the hearing held June 16, 2021. The motions (ECF No. 193, 198, and 210) are **granted in part and denied in part**.

    **1.  Procedural Posture**

On October 7, 2020, the FBI arrested Defendant Croft's co-defendants (Adam Fox, Ty Garbin, Kaleb Franks, Daniel Harris, and Brandon Caserta) in Michigan, pursuant to a criminal complaint charging them with conspiring to kidnap Governor Gretchen Whitmer. (ECF No. 1, Complaint, PageID.1.) Croft was arrested on the same date, made his initial appearance in the District of Delaware, and deferred his bond hearing until his appearance in the Western District of Michigan. (ECF No. 43: Rule 5 Documents, PageID.252.) On October 13 and 16, 2020, this Court

held a preliminary examination and individual bond hearings for the co-defendants. (ECF Nos. 32-50: Minutes.) The Court found probable cause supporting the complaint and ordered the defendants detained pending trial. (*Id.*) The courtroom was open to the public during the proceedings, and public audio access was provided through an open phone line. (Non-Document Notice from Chambers, Oct. 14, 2020.)

At the hearings, the government presented live testimony, documents, photographs, and audio and video recordings. After the conclusion of the hearings, various media outlets requested copies of the admitted exhibits. Because the defendants did not object to publishing the admitted exhibits, the government released copies to the press.

On December 16, 2020, a grand jury in this District charged all six defendants (including Defendant Croft) with conspiring to kidnap Governor Whitmer. (ECF No. 86: Indictment, PageID.86.)

This Court arraigned Defendant Croft and conducted his bond hearing on January 13, 2021. (ECF No. 131: Minutes, PageID.714.) The courtroom was open to the public, and public audio access was available by phone. (Non-Document Notice from Chambers, Jan. 13, 2021.) At the hearing, the government presented nine exhibits: a photograph of Defendant Croft with a "boogaloo" flag (Exhibit 1); a photograph of Defendant Croft with a tactical shotgun (Exhibit 2); audio recordings of Defendant Croft at a "militia" group meeting in Ohio (Exhibits 3, 4, and 5); a video recording of Defendant Croft firing a semiautomatic assault rifle at a field training exercise in Wisconsin (Exhibit 6); an audio recording of Defendant Croft at a field training exercise in Wisconsin (Exhibit 7); a photograph of a highway bridge near Governor Whitmer's vacation home (Exhibit 8); and a photograph of Defendant Croft's modified semiautomatic assault rifle (Exhibit 9). Exhibit 8 had been released to the media after its introduction during the October hearings.

BuzzFeed filed a motion for access to the detention hearing exhibits on May 20, 2021. (ECF No. 193, PageID.1013.) On May 21, 2021, the Detroit News and Scripps Media filed their motion. (ECF No. 198, PageID.1039.) The government and Defendant Croft filed their responses on June 1 and June 3, respectively. (ECF Nos. 204, 205.) The New York Times Company filed its own motion on June 14, 2021, in which it adopted BuzzFeed's brief. (ECF No. 210, PageID.1117.) A hearing on all three motions was held on June 16, 2021. (ECF No. 213.)

**2. Legal Standard**

Although there is a First Amendment right of access to judicial proceedings, that right is not at issue here. The exhibits the media seek were presented in open court, and the press was free to observe and report on proceedings. That is sufficient to satisfy the First Amendment. *United States v. Beckham*, 789 F.2d 401, 415 (6th Cir. 1986) (videotapes in question played at a public court proceeding, and the press was free to report on the content of the videotapes); *United States v. Dimora*, 862 F. Supp. 2d 697, 703-04 (N.D. Ohio 2012). There is particularly little concern for any First Amendment issue where the court has made efforts to facilitate public access to the trial proceedings. *United States v. Mitchell*, 2010 WL 890078, at *3 (D. Utah Mar. 8, 2010) (citing *In re Providence Journal*, 293 F.3d 1, 16 (1st Cir. 2002)). Here, in addition to public access to the courtroom, the Court made a phone line available so that those unable to be in Grand Rapids, Michigan, could listen to proceedings. Because there is "no question of a truncated flow of information to the public," this Court has fulfilled its pertinent First Amendment obligations. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 609 (1978).

What is at issue is the presumptive common-law right of access to judicial records.[1] *Beckham*, 789 F.2d at 414; *United States v. Graham*, 257 F.3d 143, 151-52 (2d Cir. 2001). That is neither a constitutional right nor an absolute right, and "courts in politically sensitive cases have a responsibility to consider both the public's interests and the court's duty of fairness in the administration of justice." *Beckham*, 789 F.2d at 409-10 (citing *Warner Commc'ns*, 435 U.S. at 597-602). However, the analysis begins with a presumption of access. *Beckham*, 789 F.2d at 413; *Dimora*, 862 F. Supp. 2d at 705. "[W]hile some other courts have held that this presumption can only be overcome by the most extraordinary of circumstances, the Sixth Circuit 'respectfully disagrees that only the most extraordinary reasons justify a restriction on the common-law right' to inspect and copy exhibits." *Dimora*, 862 F. Supp. 2d at 705-06 (citing *Beckham*, 789 F.2d at 414). The decision as to access is left to the sound discretion of the trial court, a discretion to be exercised considering the relevant facts and circumstances of the particular case. *Beckham*, 789 F.2d at 409. The interests to be weighed include: (1) the Court's supervisory powers over its own documents; (2) the benefit to the public from the incremental gain in knowledge that would result from access to the materials in question; (3) the degree of danger to the petitioner or other persons mentioned in the materials; (4) the possibility of improper motives on the part of the media; and (5) any special circumstances in the case. *Id*.

### 3. Analysis

In reviewing the relevant factors in this case, the question here is whether the special circumstances of the case, namely its high-profile nature and the extensive press coverage, render the release of the contested exhibits prejudicial to Defendant Croft's right to select an impartial

---

[1] At times, Movant Buzzfeed's brief elides the distinction between the First Amendment right and the common law right of access. However, at oral argument, Movants made clear that it was the common law right on which their motions rested.

4

jury, a fundamental right. *Beckham*, 789 F.2d at 411; *Belo Broadcasting Corp. v. Clark*, 654 F.2d 423, 431 (5th Cir. 1981) ("The judge's concern was with the rights of a yet-to-be-tried defendant; the provision of a fair and reasonable trial is a necessary and reasonable concern…."); *Dimora*, 862 F. Supp. 2d at 707 (access to exhibits from highly covered trial denied because of "serious danger that widespread release … would serve to taint the jury pool for [a retrial]"); *United States v. Thomas*, 745 F. Supp. 499, 502 (M.D. Tenn. 1990) (weighing potential effect of release of videotape on fair trial rights of defendant). "[S]ensational publicity does not necessarily deprive a defendant of a fair trial, nor does the broadcast of evidence necessarily interfere with a trial." *Beckham*, 789 F.2d at 410 n.3. However, the Court must weigh that potential prejudice against "the amount of benefit to the public from the incremental gain in knowledge that would result" from access to the exhibits at issue. *Id.* at 409. The Court's supervisory powers over its own documents are not at issue. Likewise, there is no allegation of improper motives on the part of the press. Certainly, the public's interest in the case is legitimate. The court must decide, then, whether the risk of creating a fixed impression of guilt outweighs any benefit to the public that would come from releasing the materials in question.[2] *See Belo Broadcasting*, 654 F.2d at 425 (non-publication approved where court would be "severely hampered in selecting a fair and impartial jury").

BuzzFeed asserts the exhibits sought are "not so different from the evidence released after the codefendants' preliminary hearing and detention hearings that there is a greater risk of

---

[2] BuzzFeed dismisses the government's concern that unauthorized release of the exhibits over Defendant Croft's objection could provide grounds for appeal or collateral attack. (ECF No. 193-1: BuzzFeed Motion for Access, PageID.1022.) First, BuzzFeed asserts that if Defendant Croft pleads guilty, his plea agreement will contain an appellate waiver like co-defendant Ty Garbin's. (*Id.*) This is purely speculative. Equally conclusory is BuzzFeed's argument that, "[i]f the case goes to trial and Mr. Croft is convicted, there is little risk of reversal over the disclosure of the exhibits." (*Id.*) Regardless, Buzzfeed's argument does not relieve the Court from the burden of balancing the public's right of access against the risk to Defendant Croft's right to an impartial trial jury.

prejudice to Mr. Croft than to his codefendants." (ECF No. 193-1, PageID.1022.) As to exhibits 1, 2, 6, 8, and 9, this argument is persuasive. Exhibit 8 was previously released. The rest of those exhibits are similar in nature to what has previously been released in the case and are not particularly inflammatory. Nor do they speak directly to Defendant Croft's intent to conspire to kidnap Governor Whitmer. Even the video recording (Exhibit 6), which involves Defendant Croft's participation in a field training exercise, does not provide direct evidence on an ultimate issue. Defendant Croft conceded at oral argument that his argument is less compelling as to those exhibits, and the Court agrees. The Court **grants** the motions as to those exhibits and will order the government to release Exhibits 1, 2, 6, 8, and 9.

In the audio recordings, Exhibits 3-5, and 7, however, Defendant Croft expounds in an excited tone about his intent to commit acts of terrorism and claims God has granted him permission to do so. In one recording, Croft explicitly discusses kidnapping Governor Whitmer. These recordings are more inflammatory in tone than most of the exhibits introduced at the co-defendants' hearings, and they also speak to ultimate issues, which carries the greater danger of tainting the prospective jury pool. Moreover, because these exhibits are audio recordings, they likely will be widely distributed, increasing the risk that potential jurors will hear them and pre-judge the case.

Nonetheless, Movants argue that, because the audio recordings will likely be admitted at trial, there should be little concern for jury taint. "[I]t is beyond question that … even some preexisting opinion as to the merits, does not in and of itself raise a presumption of jury taint." *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998); *see also Gall v. Parker*, 231 F.3d 265, 308 (6th Cir. 2000), superseded by statute on other grounds, as stated in *Parker v. Matthews*, 567 U.S. 37 (2012). Thus, a defendant may suffer little prejudice from the pre-trial publication of evidence

that will almost certainly be admitted at trial. *See Graham*, 257 F.3d at 155 (affirming order to disclose pretrial tapes played at a detention hearing that were not inflammatory, and there was no indication a defendant intended to move to suppress them). A prospective juror would not need to put the information completely out of mind in order to serve as a fair and impartial juror.

Defendant Croft responds that the audio recordings have been taken out of context and that, because there is a protective order in place, he is not able to release other evidence that would show the recordings in their proper light. He argues that the audio recordings should be heard in connection with all evidence at trial and that premature release of these exhibits would slant the media's reporting on the case sufficiently to prejudice the jury pool.

While these recordings are likely to be admitted at trial as admissions of a party-opponent under Fed. R. Crim. P. 801(d)(2), Defendant Croft makes a salient (if nonspecific) point in arguing that he should not be required to publicize contextualizing information to avoid having the case tried in the media before that evidence can be presented at trial in order to avoid a fixed impression of guilt. Unlike trials, bond hearings are focused on the risk of flight and the dangerousness of the defendant, rather than on evidence of guilt. As a result, the defense's presentation of evidence is not necessarily aimed at proving the defendant's innocence of the charge, but rather on ameliorating the Court's concerns regarding release on bond.[3] Moreover, bond hearings generally occur very early after the filing of a case and appointment or retention of counsel. While the government has had an opportunity to investigate the case thoroughly enough to present an indictment, the defendant has often only just learned of the charges. Defense counsel may not yet have even received any discovery. Defense counsel is rarely in a position to present evidence

---

[3] There may be scenarios, of course, where evidence properly adduced at a detention hearing might be irrelevant or unfairly prejudicial at trial: for instance, evidence of unrelated prior acts demonstrating danger to the community. The exhibits at issue here do not raise that concern.

7

during the bond hearing that the defendant believes will be exculpatory. And the defendant is cloaked in the presumption of innocence in any event. The one-sided nature of the opportunity for presentation of evidence increases the risk that release of the government's exhibits will result in a fixed impression of guilt in advance of trial.

In contrast, the incremental benefit to the public's knowledge of the proceedings is less compelling. It is undeniable that hearing the recordings will provide the public with a deeper understanding of at least the government's theory of the case. Obtaining the recordings would "increase the convenience of…news gathering and increase the vividness of … radio or television broadcasts," and there would be "an incremental increase in the quantity and quality of the transmission of the information." *See Beckham*, 789 F.2d at 413. Certainly, "tone of voice, cadence, and other 'live' effects of" audio recordings are part of "what makes the contents of the recording particularly inflammatory or memorable—and thus likely to taint the jury pool and create due process concerns." *Dimora*, 862 F. Supp. 2d at 714 (citing *Application of National Broadcasting*, 635 F.2d 945, 953 (2d Cir. 1980); and *Mitchell*, 2010 WL 890078). Nonetheless, the audio recordings have already been played in open court, and the information they contain has been disseminated to the public, so the release of the recordings themselves would only increase the public's understanding of their contents incrementally.

In *United States v. Dimora*, the Northern District of Ohio faced a similar dilemma as to whether to release audio recordings while related cases were still pending. In declining to release the recordings, that court reasoned:

> [T]he public's interest in these exhibits, and the incremental gain in knowledge that would result from being given access to the recordings and transcripts at this time, cannot be denied. Further, the wiretap recordings were a crucial part of the government's case. But these same considerations weighing in favor of ultimate release of the recordings and transcripts—public interest in these exhibits, the nature of the information contained therein, and the integral role that wiretap

>recordings played in this case—also highlight the danger of releasing these exhibits at this time. The very factors that make the recordings and transcripts significant also make it likely that releasing them while multiple cases stemming from the investigation are still pending and while this very case may still be appealed would taint the jury pool and possibly deprive the defendants in those cases of their right to due process. In this regard, the Court is mindful of its duty "to exercise an informed discretion as to release of the [recordings]."

862 F. Supp. 2d at 713 (quoting *Warner Commc'ns*, 435 U.S. at 603).

As in *Dimora*, given the competing factors here, the question is a close one. Because there has been such widespread coverage regarding the case, the release of several more exhibits might seem to increase the risk to Defendant Croft's right to an impartial jury only marginally. This kind of prognostication is necessarily uncertain,[4] though, and the audio recordings are sufficiently inflammatory and prejudicial that, in my view, the incremental risk to Defendant Croft's ability to secure a fair and impartial jury outweighs the modest burden to the common law right of public access in delaying the recordings' release until the trial of this matter. Audio recordings can be widely broadcast and edited. *See, e.g., Mitchell*, 2010 WL 890078, at *5. Even though the information contained on the tapes has been, and likely will be, extensively reported in the press, hearing the recordings firsthand is far more likely to make a longstanding impression that potential jurors may find difficult to set aside.

---

[4] Movants cite cases discussing whether media coverage required a change of venue or other remedy due to presumptive or actual prejudice to a defendant's right to a fair and impartial jury to imply that the Court cannot exercise its discretion to decline to release exhibits in advance of trial in the absence of actual or presumptive prejudice. (*See* ECF No. 193-1, PageID.1022-23.) That suggestion is at odds with the standard set out in *Beckham* and would prevent the District Court from taking steps to protect a defendant's right to an impartial jury. *Beckham*, 789 F.2d at 410 n.3 ("To affirm the district court in [declining to release exhibits], it is not necessary for us to conclude that the fairness of the trial actually would have been endangered or that the courtroom would in fact have become less orderly if the tapes and other materials would have been copied and broadcast. Considering that the public and press had full access to the proceedings, it is enough to find that the lower court weighed the proper factors as determined by the Supreme Court and reached a reasonable decision regarding permission to copy the tapes, transcripts and documentary exhibits.").

Movants argue that that risk is diluted by the passage of time, and by the size of the jury pool. *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991) ("Given the size of the community from which any potential jury venire would be drawn and the length of time before trial, only the most damaging of information could give rise to any likelihood of prejudice."). However, neither factor much reduces the risk here. While the jury in this case will be drawn from 22 counties in the western half of the lower peninsula of Michigan,[5] the subject matter of the case has been widely followed by Michiganders, many of whom already have strong feelings regarding the alleged victim, Governor Gretchen Whitmer, and the administration of Michigan's response to the Covid-19 pandemic.

Neither does the date of the trial much matter: regardless of when the exhibits are released, they likely will be featured in news stories that play immediately before and during trial. As the Supreme Court has noted (albeit in a different context), "[a] statement which reaches the attention of the venire on the eve of voir dire might require a continuance or cause difficulties in securing an impartial jury, and at the very least could complicate the jury selection process." *Gentile*, 501 U.S. at 1044. Based on the extensive media coverage during earlier proceedings, there is likely to be a high level of coverage before and during trial. Indeed, one could imagine a scenario where prospective jurors heard the audio recording exhibits on the radio on the way to the courthouse on the morning of voir dire.

Courts considering this issue have noted that a more searching voir dire, larger venire, or a change in venue may ameliorate concerns of jury taint. *See, e.g., Beckham*, 789 F.2d at 413-15, 422; *Graham*, 257 F.3d at 155. Given the substantial publicity and public interest in this case, searching voir dire and a larger venire will be necessary regardless. However, the release of the

---

[5] *See* https://www.miwd.uscourts.gov/sites/miwd/files/Juror_Selection_Plan.pdf.

audio recording exhibits would add a different dimension to the questioning and will undoubtedly increase to some degree the risk of jury taint that is specific to this defendant. *See Mitchell*, 2010 WL 890078, at *5. "Because an impartial jury has not yet been impaneled, this court cannot guard against prejudicial publicity either by sequestering the jury or by issuing cautionary instructions to avoid media reports." *Id* at *6. Finally, a change of venue should not be assumed to be the most appropriate remedy given the national publicity associated with this case, as the motions of news media from in and out of Michigan demonstrate.[6]

Finally, in the Court's view, the media's proffered rationale of oversight of the decision on bond does not outweigh Defendant Croft's legitimate concerns regarding the Court's ability to impanel a fair and impartial jury. While the public certainly has a legitimate interest in the monitoring of the Court's power to deny bond (*see, e.g., Graham*, 257 F.3d at 154), in this case there are factors that reduce any urgency in that oversight. Defendant Croft has not appealed his detention order. Time between now and trial is short, and further oversight may be had after the trial. The transcript of the hearing is available on PACER. (ECF No. 152.) Moreover, the public was free to attend Defendant Croft's bond hearing or listen to it via the public-access phone line. To the extent that Movants' counsel focused at the hearing on reporters' inability to view some of the visual evidence at the bond hearing, that is not a concern as to the audio recordings, which could have been heard even on the public-access phone line. While the audio recordings were certainly central to the Court's decision on bond, there has been ample opportunity for oversight, and delayed release of the exhibits would do little to impede that.

---

[6] I do not intend in noting this to suggest any position regarding the motion filed yesterday at ECF No. 230.

As to Exhibits 3-5, and 7, therefore, the motions are **denied** until conclusion of Defendant Croft's trial, conviction by guilty plea, or other order of the Court, whichever comes first. Because I have granted the motion in part, I will stay my order for seven days to allow Defendant Croft to file an appeal.

IT IS SO ORDERED.

Dated: July 13, 2021  /s/ Sally J. Berens  
SALLY J. BERENS  
U.S. Magistrate Judge