THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

THE UNITED STATES OF AMERICA,

    Plaintiff,

v.

ADAM DEAN FOX,
BARRY GORDON CROFT, JR.,
KALEB FRANKS,
DANIEL JOSEPH HARRIS, and
BRANDON MICHAEL-RAY CASERTA,

    Defendants.

Case No. 1:20-CR-183

Hon. Robert J. Jonker
Chief U.S. District Court Judge

---

## DEFENDANTS' JOINT SUPPLEMENT TO MOTIONS TO COMPEL

The defendants have moved to compel disclosure of materials related to the actions and handling of confidential human sources by their assigned agents. *See* RE. 225: Motion to Compel Phone Records, PageID # 1238; RE. 258: Motion to Compel CHS Records, PageID # 1400. Defendants have requested the cell-phone data for phones used by Defendant Caserta, CHS-2 (Dan), Special Agent Henrik Impola, and Special Agent Jayson Chambers. Defendants have also requested the CHS files for the CHSs involved in this case. Defendants now seek to supplement their motions, after learning last night of new information that supports the need for the discovery they have requested.

On August 26, 2021, Ken Bensinger and Jessica Garrison of BuzzFeed News broke the story "A Right-Wing Troll Appears to Have Tweeted About an FBI Investigation into the Michigan Kidnapping Plot Before It Went Public," citing Special Agent Jayson

Chambers's ownership of an "internet intelligence company" and tweets from the CEO of that company issuing "enigmatic warnings" about the "take down" in this case . . . before that take down occurred. Repeated tweets sought attention and tried to show that the CEO was a valuable source of information to (paying) third parties. The story appears here: https://www.buzzfeednews.com/article/kenbensinger/fbi-agent-michigan-right-wing-troll-cybersecurity-twitter. According to the piece, Chambers (a key agent and CHS-2's "handler" in this case) owns a company (Exeintel) linked to the Twitter account @ravagiing, which has/had more than 47,000 followers.

While Exeintel's website seems to have been taken offline after recent media inquiries, the BuzzFeed story explains, "Until its website was taken down, Exeintel [registered in Española, New Mexico] described itself as 'a group of dedicated professionals working in the shadows of cyberspace to provide actionable counterterrorism intelligence to law enforcement worldwide' and published research notes on groups including al-Qaeda." The story also claims that, "According to FBI policy, agents need formal permission to have any job outside the bureau or to own a business" and that the FBI has not commented "as to whether Chambers had received such approval."

Defendants have shown that Chambers and his partner (SA Impola) worked closely with CHS-2 Dan and instructed him in how to handle the defendants and others. To further support this position, defendants proffer the following evidence and submit the following exhibits.

### I. Special Agent Chambers designs the crime, and his communication with his undercover informant demonstrates this fact critical to the entrapment defense.

The government's agents actively planned and coordinated its efforts to induce the defendants to engage in incriminating behavior and statements, even going so far as designing the objective and structural components of the conspiracy alleged in the indictment. The government has produced some evidence of this activity in the form of text communication screenshots made between Chambers and Dan.

The Court will find attached two such screenshots (attached as proposed Exhibit 1). These screenshots document text communications that occurred between "Big Dan" and his handler, Special Agent Chambers. In this exchange, it is clear that "Big Dan" is the one coordinating and organizing a recon trip to surveille the governor's cottage. "Big Dan" here seeks authority from Special Agent Chambers to invite particular targets and asks for further clarification as to the extent of Chambers's plans by asking "would you want 2 trips or wait till we get more guys." This exchange arises as only two of the selected targets elected to ride along with "Big Dan" on the August 29, 2020 recon trip.

These surveillance trips were planned and orchestrated entirely by FBI agents and supporting undercover informants. These trips are now being advanced by the government as specific overt acts. "Big Dan" suggested the recons, invited the participants, provided transportation, gas, food, and direction, and largely determined where they went and when and how they got there.

The evidence to be deduced at trial will demonstrate the extreme lengths "Big Dan" had to go to in order to get Special Agent Chambers's intended participants moving together in a common direction in three different vehicles on the night recon of September

3

12, 2020. By 8:00 p.m. that evening, the three vehicles "Big Dan" had organized, arranged, and staged had, despite his best efforts, ended up in three locations many miles apart (i.e. Ty Garbin's property, a hotel in Big Rapids, and wandering county roads somewhere in between), requiring "Big Dan" to reconnoiter the vehicles ultimately at the Walmart in Cadillac, only then to leave and drive over an hour in a driving rainstorm in the dark to Elk Rapids, Michigan, to conduct surveillance according to Special Agent Chambers's published itinerary.

Many of these participants had no real notion of why they were going along on the ride. At the night recon, undercover FBI agent "Mark" demonstrated his concern along this line, asking "Big Dan" as they prepared to depart: "when we leave are these folks aware of where they are going?" "Big Dan" assured the undercover agent that, despite appearances, his concerns were unfounded. The trip is now being attributed to the defendants as evidence of their participation in an alleged plot made of their own design to kidnap the governor.

Contrary to the government's assertion, these "recons" are not what they appear. These recons are theatre—a stage upon which the government now intends to play out the script written and produced by its own operatives. After all, with respect to this narrative, Special Agent Chambers controls how many recons there will be, who is to be invited, and when and where they will happen. According to facts alleged in the indictment, Adam Fox is supposed to be the leader, the force driving the design of this alleged conspiracy and making these decisions for himself and others, not the government. This is the heart of an entrapment defense. The communication between Special Agent Chambers and "Big Dan" are known to the defense in only a small degree. The defense, having made this showing,

should be entitled, in any fair proceeding seeking to afford due process of law to its participants, to disclosure of the communications and file materials requested.

## II. FBI special agents and informants created crimes as an investigative practice and technique.

The defense has been provided with a small number of text exchanges between Special Agent Chambers and "Big Dan" relative to the investigation of another militia target: a resident of the state of Virginia who is identified for the purposes of this motion as "Frank"[1].

Like this case, "Big Dan" suggests to "Frank" that he engage in acts of domestic terror. Like the defendants in this case, "Big Dan" suggested to "Frank" that he attack the governor of Virginia. Attached as proposed Exhibit 3, is a screenshot wherein "Big Dan" advises his handler, Special Agent Chambers, that he intends to reach out to his target, "Frank." Special Agent Chambers replies to "Big Dan": "Mission is to kill the governor specifically." This exchange speaks for itself. The objective of the plot is clearly being derived and advanced by Special Agent Chambers. By issuing this edict, "Big Dan" has been charged to develop that plot specifically. The plot in this case shares the same objective: the governor.

Just as "Big Dan" develops a need for explosives in the instant case, "Big Dan" also suggests to "Frank" that he experiment with making an actual bomb. The screenshots attached, at proposed Exhibit 3, are a text exchange between "Big Dan" and Special Agent

---

[1] The identity of "Frank" is not disclosed for reasons of privacy. Of note is the vulnerability of this individual who is in his late 60's, a Vietnam Veteran and a career government employee who suffers from memory issues and complications from diabetes. This information has been acquired via an FBI investigative interview of "Frank," which occurred on November 11, 2020.

5

Chambers. On September 15, 2020, "Big Dan" confirms with Special Agent Chambers that the recipe to be given to "Frank" for the bomb is a "bag of ***** like a pound and a gallon of ****? Frank is asking." Chambers responds by directing "Big Dan" "to double if possible for testing purposes." "Big Dan" replies he talked to "Frank" and "He'll get it just wanted to know the amount to get." Chambers replies, "Awesome. Excellent work." The context of this conversation is solidified when "Big Dan" shares with Special Agent Chambers a screenshot of a text exchange wherein "Frank" confirms he will follow "Big Dan's" instructions, with "Ok will do I'm on it.[2] Fortunately for everyone involved, or near "Frank," "Frank" never attempted to assemble or detonate the device suggested by Special Agent Chambers and "Big Dan."

The Court will note, at the end of the last screenshot presented in Exhibit 3, "Big Dan" also reports that "Frank" has accepted his invite to attend an FTX he has planned for the last weekend in October, provided "Frank" can get a driver. "Frank" needs a driver because he is not physically capable of driving himself from Virginia to Wisconsin, the site of "Big Dan's" FTX. This FTX event, like all the others, was conceived, planned, and conducted by the federal investigative team of agents and undercover informants working together to provide a stage upon which to manipulate their targets into acting out ostensibly incriminating behavior the government hoped to elicit in its bid to develop and then "interrupt" the operation of a "domestic terrorist organization."

---

[2] The attached proposed exhibit has been redacted to eliminate the actual ingredients suggested to "Frank" by Special Agent Chambers and "Big Dan," as well as references to actual names. The defense has confirmed that the recipe and instructions provided to "Frank" will result in the making of a dangerous explosive device.

The defense has no other communications between the FBI handlers and the other undercover informants. The little documentation that the government has disclosed has been material to the establishment of an entrapment defense. The Court is reminded that FBI Special Agent Impola specifically instructed "Big Dan" on June 3, 2020, not to suggest ideas, actively participate in mission planning, or help the Wolverine Watchmen leadership maintain control over the group.

Special Agent Impola's protocols are obviously related to the notion that the government's undercover agents are not to engage in conduct that would entrap their targets. The limited evidence provided gives a strong basis for concluding that Special Agent Impola's protocols were violated, if not entirely abandoned in this case. The communications of the special agents and undercovers, as to one another, and as between undercover agents, are material and essential to the defendants in this case. Justice requires the production of these communications well in advance of trial.

Defendants now also know that, while this regular contact occurred, SA Chambers was operating a website that tried to make money by predicting the very "takedown" Chambers and others coordinated through Dan. This supports the defendants' right to review the phones and the files that they have requested.

Essentially, if the story is correct, not only did the CHSs involved in this case have significant financial stakes in the investigation—and ultimately in securing an indictment—but at least one agent, the handler of the government's most active CHS, did as well. The evidence documented in the story suggests that Special Agent Chambers used the investigation to promote his company and its services.

Because these facts are just developing, it is possible that the government will see the problem with Chambers's conduct and the need to voluntarily produce the information that the defendants have requested. Defendants hope that this will occur, and defendants are not saying that the government has yet refused to make the production. The Court will know more about this by September 2.

Chambers's financial stake in the investigation, of course, constitutes discoverable material under *Brady v. Maryland*, 373 U.S. 83 (1963). *See, e.g.*, *United States v. Turner*, No. CR05-355C, 2007 U.S. Dist. LEXIS 24850, at *14 (W.D. Wash. Apr. 3, 2007) (unpublished) ("Defendant requests all 'evidence that any government witness has a financial stake in the trial, including the reduction of a civil judgment against them, or any expectation of restitution if [the defendant] is convicted.' The Government concedes that such information must be disclosed under *Bagley* and *Giglio*. The Court agrees."). And an agent's actions and knowledge, of course, may be imputed to the prosecution. *See, e.g.*, *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007). Under *Brady*, prosecutors have a duty to learn of any favorable evidence known to those acting on the government's behalf in a case, including police officers and agents. *See id.* Agent Chambers was no mere cooperating witness or "independent actor." *Cf. id.* He represented and continues to represent the government.

While the conditions here render the case somewhat distinct from the perspective of imputing knowledge to the prosecution, the fact remains that extremely significant *Brady* material exists and has not been shared with the defense. If the government was unaware of this information until the BuzzFeed article was published, then the government should agree to disclose the information immediately. If the government knew about the

8

information earlier, the problem is much greater. The prosecutors handling this case are entitled to the benefit of the doubt. But this situation underscores the defense's due-process need for access to the CHS and agent materials at issue. Simply, someone has to review these items—diligently—to determine whether other exculpatory material, and material essential for a defense and bearing on a verdict, exists. The government, with its hardly disinterested agents, cannot perform this task reliably. And even if the government turns over everything it has, agents themselves—like Special Agent Chambers—may withhold critical information. But at least compelling the government to produce what it has is a step toward satisfying due process here.

In light of the circumstances, the political stakes, and the media coverage of this case, SA Chambers's actions, if not fully disclosed and investigated, will make this case feel like another version of the situation that occurred in *United States v. Stevens*, No. 1:08-CR-231 (D.D.C. 2008), may be in the offing. *See, e.g.*, Carrie Johnson, "Report: Prosecutors Hid Evidence In Ted Stevens Case," NPR (Mar. 15, 2012), *available at* https://www.npr.org/2012/03/15/148687717/report-prosecutors-hid-evidence-in-ted-stevens-case. The defense hopes it can contribute, at least in some measure, to stopping this.

With this instant supplement, the defense in no way intends to abrogate its options with regard to further action on these topics (for example, a motion to dismiss). Dismissal in this and analogous contexts can and does occur. *See, e.g.*, *Stevens*, No. 1:08-CR-231, RE. 126: Motion to Dismiss, at 9 (collecting cases). But it wishes to raise these vital issues for consideration at next week's hearing.

9

## *Conclusion*

For these reasons, and those in the original motions on these matters, due process requires full disclosure of all materials related to the content of the phones and the CHS files that the defendants have requested.

Respectfully submitted,

Date: August 27, 2021

/s/ Christopher M. Gibbons
Christopher M. Gibbons
GIBBONS & BOER
Attorney for Defendant Adam Fox
2404 Eastern Ave SE
Grand Rapids MI 49507
(616) 460-1587

/s/ Joshua A. Blanchard
Joshua A. Blanchard (P72601)
BLANCHARD LAW
Attorney for Defendant Barry Gordon Croft, Jr.
309 S. Lafayette St Ste 208
PO Box 938
Greenville, MI 48838

/s/ Scott Graham
Scott Graham
SCOTT GRAHAM, PLLC
Attorney for Defendant Kaleb Franks
1911 West Centre Avenue, Suite C
Portage, MI 49024
(269) 327.0585

/s/ Julia A. Kelly
Julia A. Kelly (P77407)
WILLEY & CHAMBERLAIN LLP
Attorney for Defendant Harris
300 Ottawa Avenue, N.W., Suite 810
Grand Rapids, MI 49503
(616) 458-2212

/s/Michael D. Hills
Michael D. Hills (P58571)
Attorney for Defendant Brandon Caserta
HILLS LAW OFFICE, P.C.
425 South Westnedge Ave
Kalamazoo, MI 49007
(269) 373-5430