UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

BARRY GORDON CROFT, JR.,

Defendant.

______________________________/

No. 1:20-cr-183

Hon. Robert J. Jonker
United States District Judge

**GOVERNMENT'S SENTENCING MEMORANDUM**

May it please the Court, the United States submits the following memorandum for the Court's reference in determining an appropriate sentence:

1. Facts and Procedural History:

From before June 2020 through his arrest in October 2020, defendant Barry Gordon Croft Jr. conspired with co-defendants Adam Dean Fox, Ty Gerard Garbin, and Kaleb James Franks to kidnap the Governor of Michigan. (R. 172: Superseding Indictment.) Croft also conspired with Fox to use a weapon of mass destruction in furtherance of the plot, and possessed an unregistered destructive device. (*Id.*, PageID.967-969.)

Garbin and Franks both pled guilty to the kidnapping conspiracy. At Croft's first trial, the jury acquitted co-defendants Daniel Joseph Harris and Brandon Michael-Ray Caserta, and deadlocked as to Fox and Croft. (R. 622: Declaration of Mistrial, PageID.6029.) At the retrial, the jury convicted Fox and Croft of all counts against them. (R. 728: Minutes of Jury Trial, Day 11, PageID.9039.) In a related

state trial in Jackson County, Michigan, three additional members of the Wolverine Watchmen militia (Joseph Morrison, Paul Bellar, and Pete Musico) were convicted of providing material support for the terrorist plot; a felony carrying a 20-year maximum penalty. Additional defendants are pending trial on similar charges in Antrim County.

Since the facts are well known to the Court that presided over both federal trials, this memorandum will highlight only a selection of testimony and exhibits pertinent to the guideline calculations and statutory sentencing factors.

2. Guideline Issues:

a. Scoring of Count 2

In its amended order rescheduling sentencing, the Court asked the parties to brief whether the offense level for Count 2 should be scored under USSG § 2M6.1, as provided in the initial PSR. (R. 783: Order, PageID.783-84.) The government agrees that it should be scored under § 2K1.4 instead.

"To determine which guideline to apply, the Court undergoes a three-step process: (1) identify the charge from the indictment and jury instructions, (2) find the substantive offense in the guidelines' statutory index, and (3) find the applicable guideline range. Often times the statutory index references more than one guideline for a particular statute, and in those circumstances the Court must use the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted. To determine which guideline is the most appropriate, the Court considers the language in the guideline itself, as well as the 'interpretative

and explanatory commentary to the guideline' provided by the Sentencing Commission." *United States v. Allen*, 364 F. Supp. 3d 1234, 1241 (D. Kan. 2019) (internal citations omitted).

The substantive offense in Count 2 is using a weapon of mass destruction, in violation of 18 U.S.C. § 2332a. (R. 172: Superseding Indictment, PageID.968.) The specific type of weapon was a bomb; that is, a destructive device as defined at § 2332(c)(2)(A) and 18 U.S.C. § 921(a)(4). (*Id.*) The statutory index indeed references more than one guideline for the statute: §§ 2A6.1, 2K1.4, and 2M6.1.

The language of the guideline commentary suggests § 2M6.1 is not the appropriate section in this case, since it says "weapons of mass destruction" has the meaning given that term in 18 U.S.C. §§ 2332a(c)(2)(B), (C), and (D) (chemical, biological, and nuclear weapons, respectively) § 2M6.1, Application Note 1. We assume the omission of § 2332a(c)(2)(A) (destructive devices) was purposeful, and that offenses under that subsection are to be indexed to a different guideline. *Allen*, 364 F. Supp. 3d at 1242.

The appropriate guideline is § 2K1.4 (Arson; Property Damage by Use of Explosives),[1] which provides a base offense level of 24 if the offense (A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense, and that risk was created knowingly; or (B) involved the destruction or attempted destruction of a dwelling, an airport, an aircraft, a mass transportation facility, a mass transportation vehicle, a maritime facility, a vessel,

[1] § 2A6.1, which covers threatening or harassing communications, hoaxes, and false liens, is clearly not the most appropriate guideline for the offense.

or a vessel's cargo, a public transportation system, a state or government facility, an infrastructure facility, or a place of public use.

The conspiracy in Count 2 involved using explosives to destroy a bridge, and using anti-personnel shrapnel bombs against law enforcement. Both would have created substantial risk of death or serious bodily injury if completed. In addition, the bridge was both a "place of public use"[2], and a "public transportation system."[3] USSG § 2K1.4, App. Note 1. Therefore, the appropriate base offense level for Count 2 is 24.

b. Terrorism Adjustment

(1) *Generally*

If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, the base offense level is increased by 12 levels, and the criminal history category becomes VI. USSG § 3A1.4(a), (b). "A 'federal crime of terrorism' has two statutory elements. One concerns motivation: The offense must be 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.' 18 U.S.C. § 2332b(g)(5)(A). The other concerns the nature of the offense: It must violate one of a list of criminal provisions ranging from the production of biological weapons to the kidnapping of

[2] Defined as "those parts of any building, land, street, waterway, or other location that are accessible or open to members of the public." 18 U.S.C. § 2332f(e)(6).

[3] Defined as an "instrumentality used for the transportation of persons or cargo." 18 U.S.C. § 2332f(e)(7)

members of Congress. *Id.* § 2332b(g)(5)(B)." *United States v. Doggart*, No. 20-6128, 2021 U.S. App. LEXIS 33024, at *4 (6th Cir. Nov. 3, 2021).

(2) *Predicate offense*

Croft's conviction for conspiracy to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a(a)(2)(A), is a listed predicate offense for application of the terrorism enhancement. 18 U.S.C. § 2332b(g)(5)(B)(i). In *United States v. Suarez*, 893 F.3d 1330, 1337 (11th Cir. 2018), the court affirmed a life sentence for a defendant with no criminal history who was convicted of Section 2332a for planning to detonate a bomb on Key West. "Indeed, Congress and the Sentencing Commission intended the terrorism enhancement to apply to [this] crime. The definition of a federal crime of terrorism in § 3A1.4, by incorporating § 2332b(g)(5), specifically includes a conviction under 18 U.S.C. § 2332a, the weapons of mass destruction crime for which [the defendant] was convicted." *Id.* The terrorism enhancement applies to inchoate offenses, such as attempt and conspiracy, just like completed attacks. *United States v. Hayne*, 835 F. App'x 855, 856 (6th Cir. 2020) (enhancement applied where defendant attempted to blow up a bridge with an improvised explosive device).

(3) *Motivation*

The only remaining question is whether Croft intended to influence the conduct of the government through intimidation or coercion, or retaliate against government conduct. Either motive is enough to support the enhancement. *United States v. Varnell*, No. 20-6040, 2021 U.S. App. LEXIS 36684 (10th Cir. Dec. 13,

2021). The court in *Varnell* found both motivations present where the defendant said, "This country needs a revolution and the government needs to be weakened to give people the courage to do it," and said he was, "going after government officials once militias start getting formed." *Id.*, at *21-22.

Long term planning is not required and influencing the government need not be the defendant's ultimate or sole aim. *United States v. Wright*, 747 F.3d 399, 408 (6th Cir. 2014). Specific intent may be inferred from circumstantial evidence, such as the "natural inference" arising from an attack on a government office. *Id.* The defendant's motives for retaliation need not be particularly coherent or consistent over time. *United States v. Van Haften*, 881 F.3d 543, 544-45 (7th Cir. 2018) (immaterial that defendant's motive for attacking United States was based on false or absurd beliefs).

Evidence adduced at trial and referenced in the Presentence Report proves Croft's long-standing aim was to influence or affect the conduct of government by intimidation or coercion, and retaliate against supposed government conduct. (R. 787: PSR, ¶ 22, PageID.10408-16.) According to his girlfriend, Croft had "We the People" and "Expect Us" tattooed on his arms, and the "Three Percenter" logo on his hand since at least 2017. In April 2020, he advocated the wholesale destruction of the existing government on Facebook: "I believe, all it's going to take is 1 state, to burn out and hang a Govenor [sic], and those dominoes will start falling!!!%" (Gov't Ex. 4.) He told associates in May, "I want to grab them all [governors] and hold trial. A People's trial." (Gov't Ex. 12.)

Croft dismissed influencing government through democratic means, stating, "I'm not a liberal, okay? Cause I don't even play part in that fucking stupid-ass political mafia shit you dumb asses in Washington, I don't do any of that. That's gay to me. I wanna hang all of them motherfuckers, all of 'em." (Gov't Ex. 482.) He added, "All that 'voting' dumb shit? I sat there arguing with motherfuckers last night, talking about voting, voting, voting? Man, fuck you." (Gov't Ex. 482.) Instead, he advocated using intimidation and coercion: "One criminal governor in our possession, we've captured the flag in that state. We can then start to issue terms." (Gov't Ex. 14.) He opined, "Michigan's government is target of opportunity." (Gov't Ex. 71.)

At his meeting with the other conspirators in Wisconsin in July, Croft again advocated using force instead of the ballot: "How many Novembers have we come to? In, in the time I've been in this movement, we've been looking at pivotal Novembers. Man, I'm sick of looking forward to, fuck November." (Gov't Ex. 110.) When Caserta told him that day, "I think she [Gov. Whitmer] would be a good example," Croft responded, "If, if we get her in custody, okay, and I hold a trial. I mean, I can hold a legitimate trial based on facts and evidence presented, man. That's all I need. That's all I need, is to hold her accountable for her actions, have her adjudged, and treason is a hanging offense." (Gov't Ex. 106.) Croft told the conspirators, "I don't like seeing anybody get killed either. But you don't make an omelet without breaking a few eggs, you know what I mean?" (Gov't Ex. 93.)

As the court observed in *Van Haften*, it is immaterial that Croft's political philosophy was incoherent, or that his plan to overthrow the government was based on false or absurd beliefs. When directly asked, "How are you going to accomplish that?" Croft replied that he would do it through intimidation and coercion: "Well, IEDs. The things that your enemy, practice insurgency. Study insurgency … You can go, go learn." (Gov't Ex. 34.) As he explained to Caserta and Garbin in September, "Fear. If they're afraid and they bleed we can fucking kill them. So for the first time in life we're seeing fucking fear out of them and we're doing something right. Look at how small this group is. When we show them out there you can win, get out of the way." (Gov't Ex. 220.)

Perhaps Croft said it best when he told his confederates in Dublin, Ohio: "I'm going to terrorize. You want a terrorist? You've labeled me a terrorist. I'm going to go be what I am, I'm going to go be what I am. You're all terrorists." (Gov't Ex. 34.)

c. Official Victim Adjustment

The sentencing guidelines provide that if the victim was a government officer or employee, and the offense of conviction was motivated by such status, the offense level is increased by three. USSG § 3A1.2(a). If the offense of conviction is found in Chapter Two, Part A of the guidelines (Offenses Against the Person), the offense level is increased by six. USSG § 3A1.2(b).

The Sixth Circuit has repeatedly rejected claims that the "official victim" enhancement only applies to federal officers or employees. "We hold that federal criminal sentences may be enhanced pursuant to § 3A1.2(a) if the underlying

conduct was motivated by the victim's status as a state or local government employee." *United States v. Hudspeth*, 208 F.3d 537, 540 (6th Cir. 2000) (county prosecutor). *See also United States v. Manns*, 690 F. App'x 347, 354 (6th Cir. 2017) (county prosecutor and clerk of court).

"'Motivated by such status,' for purposes of § 3A1.2, means that the offense of conviction was motivated by the fact that the victim was a government officer or employee . . ." USSG § 3A1.2, App. Note 3. "This adjustment would not apply, for example, where the both the defendant and victim were employed by the same government agency and the offense was motivated by a personal dispute." *Id.*

Because Croft does not object to the official victim enhancement, the government will not address the issue at further length in this memorandum. (R. 778: Restricted Access Objections to Initial PSR, PageID.10216.) The government will respond further if Croft changes his position.

d. Leadership Enhancement

(1) *Generally*

If the defendant was an organizer or leader of a criminal activity that involved five or more participants, or was otherwise extensive, the offense level is increased by four. USSG § 3B1.1(a). There can be more than one person who qualifies as leader or organizer of a criminal association or conspiracy. *United States v. Grigsby*, 692 F.3d 778, 791 (7th Cir. 2012).

Factors the Court should consider in deciding who is an "organizer or leader" include the exercise of decision-making authority, the nature of participation in the

commission of the offense, the recruitment of accomplices, and the degree of participation in planning or organizing the offense. USSG § 3B1.1, App. Note 4.

(2) *Leader or organizer:*

The enhancement can apply whether the defendant is a leader *or* an organizer. "While there is overlap between the activities that would make a defendant a leader and those that would make a defendant an organizer, the two are distinct." *United States v. Martinez*, No. CR 19-3725 JB, 2021 U.S. Dist. LEXIS 230760, at *42-43 (D.N.M. Dec. 2, 2021). "[W]hile control over subordinates is required to find that a defendant played a management, supervision, or leadership role in a criminal activity … a sentence enhancement under § 3B1.1(c) for a defendant who acts as an organizer does not require the presence of underlings in the endeavor. As a result, a defendant may be punished as an organizer under § 3B1.1(c) for devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants." *United States v. Valdez-Arieta*, 127 F.3d 1267, 1272 (10th Cir. 1997.)

While the Tenth Circuit does not seem to require an organizer to exercise direct control over anyone, the Sixth Circuit requires a finding that the defendant exerted control over at least one individual. *See, e.g., United States v. Huff*, No. 3:10-CR-73, 2012 U.S. Dist. LEXIS 61539, at *31-32 (E.D. Tenn. May 2, 2012); *United States v. Swanberg*, 370 F.3d 622, 629 (6th Cir. 2004) (enhancement inappropriate

where defendant "merely exercised control over the property, assets or activities of the enterprise.").

The Fifth Circuit, which has a similar rule, clarified that the leader or organizer can exert control over five or more participants (or an otherwise extensive criminal activity) *through* that one person, however. *United States v. Blaylock*, 413 F.3d 616 (7th Cir. 2005). In that robbery case, the defendant was the impetus behind the crime, devised the plan, and recruited three participants, who in turn recruited all the remaining participants. *Id.*, at 621. The Court held "we do not mechanically require the defendant to exercise 'control' over four other participants in order for the four-level adjustment to apply. All that is required is that the defendant provide leadership and organization for a criminal enterprise comprised of five or more persons and actually control at least one of the participants." *Id., citing United States v. Kamoga*, 177 F.3d 617, 618-20 (7th Cir. 1999) (four-level enhancement applied where defendant recruited two middlemen and directed them to enlist others to deposit defendant's counterfeit checks).

In this case, Croft was the impetus behind the crime. Eight months before his multi-state militia meeting, he posted, "Planning a flash gathering in Ohio soon. Flash, 2 weeks max notice, too quick for the feds to cut red tape and infest." (Gov't Ex. 499.) As he explained to Fox before they met in Dublin, "We're going to be going in here and talking like fucking *men*, saying the things that men need to say. Getting some conceptions that you may have never entertained a day in your life." He went on, "I'm gonna tell you exactly what you're looking at, where we see these

things at, used in other countries against *them*, and then we're gonna talk about how to deal with it in this country in the here and now. And, you know, I'm gonna leave it open to the men, man. What do we want to do? Do we want to go right now? What do we want to do? Cause I'll plan any which way we want to do it." (Gov't Ex. 490.) In other words, it was Croft's concept, he would explain how it could be accomplished, and would plan its execution.

Croft also exercised control over at least one participant: Fox. He recruited him in May 2020, providing his phone number and asking, "Might I request a call, good sir?" (Gov't Ex. 13.) He then filled Fox's head with pseudo-religious and pseudo-historical justification for insurrection. In a private call, he persuaded Fox, "Is it normal to kill your brother? No, but Cain did it. Is it normal to steal another man's wife? No, but King David did it. And God called King David a man after his own heart. See, God understands that creatures that are evil in this fleshly form are gonna do that. They're gonna be that. The only way that you can defend yourself against is to get more evil than they are." (Gov't Ex. 25.) In Dublin, he similarly assured potential recruits that they had God's sanction to break the commandment against murder: "Father knows why. I've already asked permission, it's been granted." (Gov't Ex. 34.) Fox was evidently convinced, telling a friend, "I know Croft is extreme and crazy, but he's in this shit for real." (Gov't Ex. 495.)

Even before the Dublin meeting, Fox assured Croft he was recruiting others for him: "I'm gonna actively begin recruiting to build my regiment here. I can't fucking wait man … Second Continental Michigan Regiment, Second CMR, baby!"

(Gov't Ex. 491). The name was no coincidence, but rather a direct reference to the "2nd Cont. Del. Reg't" (Second Continental Delaware Regiment) tattooed on Croft's arm. (Gov't Ex. 48.)

When Fox needed help explaining the concept to recruits, he turned to Croft: "Hey, explain to me again the Second Continental Michigan Regiment, so I can get out and talk about it and I don't sound like a fucking moron." (Gov't Ex. 487.) Croft told Fox it was "a continuation of the First Continental, that fought for the country in the first place." (Gov't Ex. 489.) He added, "it was a conception that I came up with a long time ago … regardless what any other militia gets called, eventually they're going to get called the Second Continental, cause they're all gonna form alliances that make up an army that stands against these fucking redcoats." (*Id.*)

Almost immediately after the Dublin meeting, Croft promised to send Fox recruiting leads. He told him in a private call, "You're also gonna have people from Michigan tell you, 'Yo, Croft sent me to you.' You know what I mean? So, you know, I'm putting, I'm putting them cats on you, brother. It's gonna be that. And they gonna form up on us, and we're gonna do our thing, man." (Gov't Ex. 50.) Croft contacted Joe Morrison, leader of the Wolverine Watchmen, and told him, "Yes, get with Adam Dean Fox. We are going to as we had historically. 2nd Continental Michigan regiment is forming as a constitutional defense apparatus." (Gov't Ex. 43). Morrison replied, "I'll reach out." (*Id.*)

When Morrison reached out the same day, Fox said, "[I]f Barry said we have the same common goal, then I'm sure we do, and me and you definitely need to sit

down and talk." (Gov't Ex. 45.) After talking to Morrison, Fox reported back to Croft that his recruiting efforts were bearing fruit: "Hey brother, hope all is good. Your boy from fucking, Wolverine Watchmen here in Michigan hit me up. … It's good looking, if this guy checks out. Sounds like he's got a decent sized group man. I'm gonna be growing a fucking army here, bro. Ha! Fucking army man! Fuck a militia, we're gonna grow a fucking army!" (Gov't Ex. 493.)

Fox later reported back to Croft on his success, and said he was planning to bring recruits to Wisconsin to train: "Yeah, I'm fully intending on bringing a ton of people with me, too. A lot of these Mich–excuse me, Wolverine Watchmen to come with, and then, if I get some from Michigan Home Guard, might have a couple from Michigan Liberty Militia." (Gov't Ex. 68.)

Croft traveled from Delaware to Wisconsin meet and train with those recruits, explaining to an informant, "I need to get these guys demolitions trained, bro. That's the element the militia's missing." (Gov't Ex. 85.) To that end, he brought bomb-making supplies and attempted to construct an IED with Garbin and Harris. He left those at the camp overnight, telling the informant, "If the feds ping my phone and roll me, you know what I mean, I don't want to be with the explosive device." (Gov't Ex. 86.)

When given the floor at a team breakfast, Croft urged the conspirators toward the plan he had conceived: "Like, we are all out here training and what not, right? You know why we're training? You understand why we're here? I mean everybody is on the same page as far as why we're, we're out here doing all these

things. … So, at some point we're going to have to clear the rubbish out of the way." He added, "That's, now is the time where that separation has to occur cause these government, these governors are destroying this nation." (Gov't Ex. 109.)

Later in Wisconsin, Croft told an informant that he had left his 37-millimeter projectile launcher with the group to train for their mission: "[T]here's a couple of them that understand exactly what I mean. And, and I'm leaving that here for them to experiment with." (Gov't Ex. 108.) Croft then laid out the plan the group would later train for in more detail:

> If I can plan an operation where I can rain down on an empty fucking field of police cars, inhibiting their travel, okay? And then simultaneously plan an operation across town where I drop a communications tower. And all the while, have a team standing by to grab a fucking governor…
>
> and while it's all in the midst of confusion, there's a tornado spinning through your fucking community, wham! A quick, precise grab on that fucking governor. And all you're going to fucking end up having to possibly take out is her armed guard. Whitmer. Whitmer. Michigan. Whitmer. Her armed guard. …
>
> [I]f that precise group of seven men are prepared for the job? I've put three of them as snipers with FLEERs, so their fucking shooting at heat signatures, dropping those fucking armed guards before we even broach the fucking house. All that's left leaving is her, you understand?

(*Id.*)

Croft did not leave the plan in the hands of underlings after that, but traveled across country to personally attend the final reconnaissance and training in Luther, Michigan. When they arrived at the boat ramp across the lake from the Governor's home at night, Croft helped Fox find the target: "[B]ased on what the map looks like, she should be right at about around those three lights dead ahead,

based on what the map looks like. Yeah, it, it, it actually ends over here. But her house by the, by the, you know, the address, should be either in between those three dots, or that orange light to your left." (Gov't Ex. 248.) He pointed out a convenient place to extract the Governor to Lake Michigan: "That's the, that's the land, the land hop we're talking about, right here." (Gov't Ex. 245.)

Croft told the conspirators they would "have to verify" the nature of the Governor's protective detail (Gov't Ex. 254), and said, "We can hit them with quantity, but we definitely have to pick up our quality as well. That's why incendiaries are absolutely necessary. If you have something shoulder-fired you can go on a lead vehicle." (Gov't Ex. 249.) He told an informant to take his 37-millimeter projectile launcher for that purpose, saying, "That's, that's why I wanted it played with, man." (*Id.*) When Franks asked what would happen after the assault, Croft told him, "That's something you're going to need to think about then. If we're going to carry out an operation of this magnitude you are going to have to walk away from life. You will be living as a self-proficient unit foraging for everything you get. We will be fighting our way in and out of every situation we encounter. That simple." (Gov't Ex. 257.) Before leaving Luther, Croft used materials he had brought to construct and detonate an anti-personnel explosive device with pennies for shrapnel. (Gov't Ex. 222.)

Croft was a leader or organizer of the criminal activity because he conceived the plan, recruited Fox, helped Fox recruit others. He provided inspiration and direction online from at least May 2020, in person in Ohio in June; in Wisconsin in

July; and in Michigan in September. The eventual plan was comprised of elements Croft laid out, including targeting a state governor, and using improvised explosives to hinder law enforcement. He provided the wherewithal to accomplish the criminal objective, including an assault rifle, projectile launcher, and bomb-making materials. Although he may not have had hierarchical control over all the other participants, he coordinated and pushed the implementation of the conspiracy from its inception to its final stages.

(3) *Five or more participants:*

The Guidelines define a participant as a "person who is criminally responsible for the commission of the offense, but [who] need not have been convicted." *United States v. Rathod*, 826 F. App'x 527, 537 (6th Cir. 2020), citing USSG § 3B1.1 cmt. n.1. "[C]ases applying the guideline uniformly count as participants persons who were (i) aware of the criminal objective, and (ii) knowingly offered their assistance." *Id.*, *citing United States v. Anthony*, 280 F.3d 694, 698 (6th Cir. 2002).

Leaders and organizers, including the defendant himself, are counted when tallying the number of participants. *United States v. Paccione*, 202 F.3d 622, 625 (2d Cir. 2000) (collecting cases). Other participants need not be involved in every aspect of the crime. *United States v. Fosher*, 124 F.3d 52, 56-57 (1st Cir. 1997) (participant did not participate in the robbery, but assisted the defendant in targeting the victim's home, and provided a home in which the planning meeting took place.)

Participants can also include acquitted defendants. *United States v. Hardwell*, 80 F.3d 1471 (10th Cir. 1996). Where the jury does not find co-defendants guilty beyond a reasonable doubt, the district court is not foreclosed from finding by a preponderance of the evidence that they were "criminally responsible" and thus participants the defendant's conspiracy. *United States v. Lacey*, 86 F.3d 956, 968 (10th Cir. 1996).

"If the offense involved fewer than five participants, the 'otherwise extensive' language of § 3B1.1(a) is an alternative ground on which the sentencing court may base its decision to depart upward." *United States v. Anthony*, 280 F.3d 694, 699 (6th Cir. 2002), *citing United States v. Carrozzella*, 105 F.3d 796, 803 (2d Cir. 1997). The leadership enhancement is appropriate where the "otherwise extensive" activity is the functional equivalent of a crime involving five or more participants. *Id.* Application Note 3 is the starting point of the analysis. *Id.*, at 700. It provides that "in assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the services of many outsiders could be considered extensive." USSG § 3B1.1, App. Note 3.

(4) *"Otherwise extensive"*

In considering whether a criminal activity is otherwise extensive, the sentencing court should examine: (i) the number of knowing participants; (ii) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; and (iii) the extent to which the services of

the unknowing participants were peculiar and necessary to the criminal scheme. *Anthony*, 280 F.3d at 700-01, *citing Carrozzella*, 105 F.3d at 804.

e. Incomplete Conspiracy Reduction Not Warranted

Like Fox, Croft may argue his guideline range should be reduced by three, because the offense was a conspiracy rather than a completed kidnapping. The sentencing guidelines provide the base offense level for attempt, solicitation, or conspiracy is the same as for the substantive offense, subject to any adjustments. USSG § 2X1.1(a). "If the offense is a conspiracy," however, the level is decreased by three "unless the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense or the circumstances demonstrate that the defendant was about to complete all such acts but for apprehension or interruption by some similar event beyond the defendant's control." USSG § 2X1.1(b)(2) (emphasis added).

The reduction is only to be applied when the arrest occurs well before the defendant or any co-conspirator has completed the acts necessary for the substantive offense. *United States v. Lyles*, 506 F. App'x 440, 452 (6th Cir. 2012). *But see United States v. Quinn*, No. 17-4082, 2018 U.S. App. LEXIS 3289, at *2-6 (6th Cir. Feb. 12, 2018) (denial of § 2X1.1 reduction was harmless error where police arrested conspirators before they completed burglaries needed to raise funds to purchase explosives.)

In *United States v. McGarr*, 330 F.3d 1048 (8th Cir. 2003), the Hobbs Act robbery conspirator argued the reduction should apply, because the government

failed to prove that, but for official interference, the conspirators would have carried out the robbery. The district court "found that the conspirators had conducted sufficient planning and had sufficiently set in motion those events necessary for execution to make completion of the offense reasonably certain. In addition, the district court found no meaningful indication that, absent official interference, any of the conspirators were likely to abandon the enterprise," and properly denied the reduction. *Id.*, at 1050.

The Fifth Circuit has laid out four non-exhaustive considerations to guide its courts' application of the guideline:

> First, the § 2X1.1(b)(2) inquiry focuses on the substantive offense and the defendant's conduct in relation to that specific offense. Second, § 2X1.1(b)(2) does not require the reduction for a conspirator who has made substantial progress in his criminal endeavor simply because a significant step remains before commission of the substantive offense becomes inevitable. Third, in order to support a denial of the reduction under § 2X1.1(b)(2), the circumstances must demonstrate that the balance of the significant acts completed and those remaining tips toward completion of the substantive offense. This requires that the district court consider the quality of the completed and remaining acts, not simply the relative quantities of each. Fourth, a sentencing court should consider the temporal frame of the scheme and the amount of time the defendant would have needed to finish his plan, had he not been interrupted. As the completion of the offense becomes more imminent, the reduction will become less appropriate.

*United States v. Soto*, 819 F.3d 213, 217-18 (5th Cir. 2016) (reduction properly denied where court found defendants would have sent ammunition to Mexico but for law enforcement intervention) *citing United States v. Waskom*, 179 F.3d 303, 308 (5th Cir. 1999) (determining whether a three-level reduction under § 2X1.1(b) is warranted requires a fact-specific inquiry that "resists a precise standard.")

In Croft's case, a significant step remained before the commission of the substantive offense became inevitable. That is, the defendants had not yet launched their attack. But Croft and his co-conspirators had made substantial steps in the criminal endeavor. Those included two reconnaissance trips, multiple training exercises, and the acquisition of specialized weapons and equipment, including assault weapons, body armor, and night vision equipment. The balance of the significant acts completed and those remaining tipped toward completion of the substantive offense. Fox had in fact already packed his "kidnapping kit," a backpack containing zip ties, duct tape, and a combat knife. (Gov't Ex. 339.) Through trial and error, Croft had constructed a functioning destructive device to use against law enforcement. (Gov't Ex. 222.)

Croft and his co-conspirators also had enough time to complete their plan, had they not been interrupted. Fox told the other conspirators they had only "six weeks until the [November 2020] election," and they needed to "utilize these 5 weekend (sic) best we can." (Gov't Ex. 443.) Although the conspirators may have wanted explosives to blow up the M-31 bridge, they had already made all the preparations necessary to kidnap the Governor by the time they were arrested in October 2020. As Fox put it, "It's going to be opportunistic. Like it's going to be, when the, the asset arises there, boom, we got to go." (Gov't Ex. 264.) Because the completion of the offense was imminent, and there was no meaningful evidence that, absent official interference, any of the conspirators were likely to abandon the enterprise, the reduction is inappropriate. It should be noted that the Court did not

apply an "incomplete conspiracy" reduction in either Garbin's or Franks' cases, and both were involved in the same conspiracy as Fox and Croft.

In *Unites States v. Rorrer*, 161 F. App'x 518, 520 (6th Cir. 2005), the Sixth Circuit affirmed the district court's denial of the "incomplete offense" reduction because "co-conspirators had completed all the acts necessary on their part for money laundering, and the only remaining step, repayment of the loan, was up to a third party who was beyond the conspirators' control." The same is true here: the only remaining step was for the Governor to appear at her cottage so they could launch their plan, but fortunately she was still beyond their control.

f. Grouping of Counts of Conviction

The Court asked the parties to brief whether Croft's two counts of conviction should be grouped together for scoring purposes. (R. 783: Order, PageID.10332.) The relevant guideline section provides, "All counts involving substantially the same harm shall be grouped together into a single Group. Counts involved substantially the same harm within the meaning of this rule… When counts involve the same victim *and* two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." USSG §3D1.2(b) (emphasis added). "The key to determining whether 'grouping' is appropriate under § 3D1.2(d), … would be a determination of whether the measures of harm in the relevant offense guidelines were 'essentially equivalent.'" *United States v. Harmon*, 409 F.3d 701, 709 (6th Cir. 2005).

The two counts in this case should not be grouped, because they did not involve the same victim. It is undisputed that the intended victim of the kidnapping conspiracy in Count 1 was the Governor of Michigan, which is why the PSR adds a 6-level enhancement for her status as a government officer or employee under § 3A1.2. (PSR ¶ 105, PageID.10435.) The PSR does not assess a 6-level enhancement for "official victim" status as to Count 2. (PSR ¶ 109-14, PageID.10435.)

The conspiracy to use a weapon of mass destruction in Count 2 may have been intended to facilitate the kidnapping, but its intended victim was decidedly not the Governor. Croft said his aim was to "get her in custody … and hold a trial," so he could "have her adjudged, and treason is a hanging offense." (Gov't Ex. 106.) Fox also stated their aim was to "snatch and grab" the Governor, so "either she's going to prison or she's getting hung." (Gov't Ex. 127, 128.) Blowing up the Governor on the bridge or killing her with shrapnel would have been antithetical to their primary aim in Count 1.

The actual victims of the WMD conspiracy would have been the village of Elk Rapids (whose first responders would have been hindered in an emergency by the destruction of their main highway access), any travelers or bystanders near the bridge, and the Governor's security detail. As Croft himself explained, the protective detail was exactly "why incendiaries are absolutely necessary." (Gov't Ex. 249.) Because kidnapping and using weapons of mass destruction are not "essentially equivalent" offenses, they should not be grouped under § 3D1.2.

3. Statutory Sentencing Factors:

The Court is required to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the court must consider, among other things:

*a. The nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. § 3553(a)(1)):*

As noted in the government's sentencing memorandum for co-conspirator Fox, the plot to kidnap a sitting state governor was shocking, but also similar in motivation to the bombing of the Alfred P. Murrah Federal Building in Oklahoma City. Croft encouraged his followers to believe a small group of armed insurrectionists working from inside could overthrow the legitimate government of an entire nation. As he told his conspirators on September 11, 2020, "Look at how small this group is. When we show them out there you can win, get out of the way." (Gov't Ex. 220.)

As to the characteristics of the offender, Croft has a history of both petty and serious crime. When he shot at his girlfriend's brother from his car in 1997, he told police, "It was only a BB gun." (New Castle County, Delaware, Incident Report No. 3297-041008.) He later told police it was actually his *passenger* who shot at the victim, and claimed he did not even own a gun. (*Id.*) Croft eventually pled guilty to possession of a firearm during the commission of a felony, but only after several witnesses reported that they saw the muzzle flash, Croft's relatives reported he did

have a semiautomatic pistol, and police recovered a semiautomatic pistol bullet from Croft's pocket. (R. 787: PSR ¶ 130, PageID.10439.)

This incident is not highlighted to suggest a 25-year-old offense should be scored. Rather, it demonstrates that Croft's propensity for blaming others and telling false exculpatory stories has remained a consistent personal characteristic for a quarter century. When he was arrested by FBI for kidnapping plot on December 8, 2020, Croft gave a lengthy videorecorded interview.[4] Perhaps in an effort to ingratiate himself with his interviewers, Croft claimed, "I was about to go to the Marine Corps, man … [in] ninety-seven, I wanna say," and added "Scored in the top five percent in the whole United States, sir." He said, "Was gonna do it but I shot at the guy, which got me the felony before I shipped out, and he had a shotgun."

Croft followed the same pattern in this case, blaming others for his own crime, and when convenient, disavowing his confederates to the FBI. Unaware that his Facebook posts and videos would be discovered, Croft falsely claimed that he had tried to talk others out of what was actually his own plan. He said, "From January to June, I was hearing people talk about, 'Oh well, let's jump on the Governor, let's grab the Governor,'' and claimed he told them, "What is dealing with [the Governor of Virginia] gonna do for you? Nothing. Cause they'll just put

[4] The interview could not be introduced at trial because Croft implicated Fox, who would not have been able to cross-examine Croft on the veracity of his statements. *See Bruton v. United States*, 391 U.S. 123 (1968).

somebody else in there. They'll just send somebody else. That's it. Now, and that was brought up by a guy named Frank Butler who I don't even really know."

In a telling act of projection, he further claimed to have told another Dublin attendee that grabbing a governor was "foolish … your objective is wrong. If you do something like that, you're setting the dominoes down for everybody." (Attachment 1.) Weeks earlier, Croft had literally posted that it would only take hanging one governor, "and those dominoes will start falling." (Gov't Ex. 4.)

Croft's primary defense at trial was that he had been entrapped by government informants and agents. But in his video recorded interview — before he had a chance to concoct a better story — he was asked who had invited him to surveil the Governor's house, and he said, "Adam asked me, Adam Fox." He even claimed he didn't know the purpose of the trip saying, "They asked me, 'Hey, you wanna do some land navigation, nighttime?"

As to kidnapping the Governor, Croft disclaimed any part in the planning, and blamed his Michigan codefendants: "[T]he discussions and all that originate from that crowd, okay?" He added, "I have nothing to do with that. Their Governor, I don't give two fucks for. I don't care. I don't care. I don't have a dog in the fight." (Attachment 2.) Returning to the night reconnaissance, Croft said, "Like honestly, I participated minimally," and added, "but they conversation that they were having while we were doing this was, you know, they grabbing the Governor, and I'm not with that, man." (Attachment 3.)

Croft again falsely claimed he had tried to stop his codefendants: "I said, hey, hey, listen guys, you guys' focus is all fucked up. You guys are like aimin' at State heads and stuff like that. You're a militia for Christ sakes, it's not your job to put anybody in power. It's not your job to dictate who does the job." (Attachment 4.) Croft again assured the FBI, "Like really, man. I'm not at all in for any of that governor-grabbin' shit. Like, really, got the wrong guy with that." (Attachment 5.)

Croft deliberately pushed his false entrapment narrative to the press as well. In a recorded interview on July 3, 2022, Croft told a reporter for BuzzFeed News, "I didn't know Adam Fox until June 6, at a meeting that Robeson organized." The reporter apparently fell for it, responding, "There appears to be a pretty high level of orchestration going on, from soup to nuts." (Attachment 6.)

But the "flash gathering in Ohio" that occurred on June 6 was his own idea. (Gov't Ex. 499.) Croft had been in contact with Fox since at least May 2020 (Gov't Ex. 13), and was himself the one who recruited Fox to attend the meeting. As he told Fox on June 2, "Brother, that's why I'm with you, dog. I know you're ready to fight … when I recognize and see things in people that I know to be good people, I keep them close to me. You know what I mean? It's getting ready to be that, bro, we getting ready to go to war … you're gonna see me this coming weekend, we gonna talk about all this shit." (Gov't Ex. 485.) When Croft said on June 4 that the weekend meeting was so important that he'd give up a job to attend (Gov't Ex. 488), Croft said, "I appreciate your dedication, bro, you will not be let down." (Gov't Ex. 499.) In other words, Croft knew he was lying to the press, because he knew Fox

long before June 6, and was not introduced to him by Robeson or any other government informant.

Croft was the prime mover behind the plot, but when he was caught, he blamed his followers and disowned them. These characteristics of the defendant have remained constant across half a lifetime, and argue against whatever leniency he will no doubt request.

*b. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense (18 U.S.C. § 3553(a)(2)(A)):*

The abduction of the Governor was only meant to be the beginning of Croft's reign of terror. He called for riots (Gov't Ex. 112), "torching" government officials in their sleep (Gov't Ex. 227), and setting off a "domino" effect of violence across the country. (Gov't Ex. 4.) "I don't give a shit if you tear this whole motherfucking nation down," he said, "I can't wait for war to come to this land." (Gov't Ex. 481.)

Croft's words and actions both before and after the plot also demonstrated a profound lack of respect for the law. For a primer in his own words, one need look no farther than the Frontline documentary "American Insurrection," which aired on PBS on April 13, 2021.[5] In a lengthy interview conducted from jail, Croft insisted the United States is currently under military rule, and people need to "realize they are being ruled by an illegitimate authority." (Attachment 7.)

---

[5] (https://www.pbs.org/wgbh/frontline/film/american-insurrection/). Croft's interview begins at 53:20. Because the narrator speaks over the quoted segment, it has been excerpted from the raw footage and transcribed for the Court's reference as an attachment to this memorandum.

In a jail call recorded December 4, 2022, Croft told an associate he still holds the same views: "It's not a democracy. It's not a constitutional republic. It's not by the people, for the people, of the people. It's not that at all. It's authoritarianism, is exactly what it is. And if you look up authoritarianism, it's basically military rule by force of arms." Croft would apparently prefer a lawless society where vendettas rule, telling his friend, "If you're not raping people or killing people, I don't give a fuck. And if you rape or kill somebody, I feel like, I feel like they should greenlight you, to the family of whoever you killed or raped. Just greenlight them." (Attachment 8.)

The sentence should provide just punishment, but also promote respect for the laws that separate an orderly society from anarchy.

*c. The need for the sentence imposed to afford adequate deterrence to criminal conduct (18 U.S.C. § 3553(a)(2)(B)):*

As the evidence in this case demonstrated, the internet and social media make it easier than ever for those with malign intent to reach people and draw them into violent plans to effect change. Like most terrorist leaders, Croft used those channels to find recruits, and then radicalized them with lofty appeals to an extremist yet garbled ideology, normalizing violent action, and promises of glory.

Croft's influence led many others to ruin their own lives, including a successful aircraft mechanic, and a recovering addict who had found purpose as a drug counselor. But for Croft's online recruiting and proselytization, some of those now convicted felons might have maintained law-abiding lives and chosen appropriate outlets for their interest in change. But Croft told them they could be

"re-founding fathers," in a new society, and convinced them they were the "elite" warriors to bring it about. These are the domestic version of the heady promises that lure the disaffected to join international terrorist movements around the world. Croft merits a severe sentence sufficient to deter other terrorist leaders from following in his footsteps.

*d. The need for the sentence imposed to protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(2)(C)):*

Unlike some of the other defendants in this case, Croft has a long history of antisocial behavior. He has not renounced his anti-government extremist views. And yet he has demonstrated an ability to make—and use— improvised explosive devices from readily available materials. Moreover, his ability to attract followers who will do the dirty work for him makes him a continuing danger no matter his age. Perhaps even more than Fox, he is likely to return to dangerous conduct if released.

*e. The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. (18 U.S.C. § 3553(a)(6)):*

The Sixth Circuit has repeatedly held the sentencing disparities courts should avoid pursuant to U.S.C. § 3553(a)(6) are national disparities, not disparities among specific cases. *United States v. Simmons*, 501 F.3d 620, 623 (6th Cir. 2007); *see also United States v. Bass*, 17 F.4th 629, 636 (6th Cir. 2021) (improper to compare federal and state sentences). For 3553(a)(6) purposes, "the Guidelines … are 'our barometer for promoting nationwide sentencing uniformity.'" *United States v. Hymes*, 19 F.4th 928, 936 (6th Cir. 2021) (citation omitted).

Croft may attempt to compare his sentence to the state defendants who assisted his plot. On December 15, 2022, three Wolverine Watchmen were sentenced by the Jackson County Circuit Court for material support for terrorist acts.[6] Watchmen leader Pete Musico was sentenced to 12-42 years in prison. His son-in-law and co-leader Joe Morrison received a sentence of 10-42 years. Paul Bellar received a sentence of 7-20 years' imprisonment. Although they (like Croft and Fox) were convicted by a jury contrary to their pleas, they were convicted of different offenses and under different sentencing guidelines than Croft.

Croft may also point to the sentences of co-defendants Garbin and Franks as points of comparison. It should be remembered, however, that those defendants admitted their guilt, cooperated, and expressed remorse for their crimes. Moreover, neither of those defendants was convicted of conspiracy to use a weapon of mass destruction.

As a starting point, the government has consistently supported guideline sentences for all the conspirators in the interests of fairness and consistency. For Croft, the guideline promulgated by the Sentencing Commission advises that life in prison is the lowest term sufficient to serve the purposes of a sentence for his convictions, role in the offenses and offense conduct. That guideline is higher for Croft than Garbin and Franks, but the score reflects both his leadership role, the fact that he targeted a sitting governor, and his willingness to use explosives to carry out the plot. The Court tailored Garbin and Franks' sentences to reflect their

---

[6] https://www.mlive.com/news/jackson/2022/12/defendants-sentenced-to-prison-in-whitmer-kidnap-plot-case.html

individual circumstances and culpability, as required by § 3553(a). No such grounds for departure or variance are warranted in this case.

Croft wanted to do more than kidnap the Governor of Michigan, or even kill her. He said, "I can't wait for war to come to this land," and meant it. Only a life sentence can adequately address Croft's crimes and deter him and others from pursuing such apocalyptic visions for our country.

Respectfully submitted,

ANDREW BYERLY BIRGE
Attorney for the United States,
Acting under Authority Conferred by
28 U.S.C. § 515

Dated: December 15, 2022

*/s/ Nils R. Kessler*
NILS R. KESSLER
CHRISTOPHER M. O'CONNOR
Assistant United States Attorneys
P.O. Box 208
Grand Rapids, MI 49501-2404
(616) 456-2404
*nils.kessler@usdoj.gov*