## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

**UNITED STATES OF AMERICA,**
             Plaintiff,

|  |  |
|---|---|
| **vs.** | Case No. 1:20-cr-183-RJJ |
|  | Hon. Robert J. Jonker |

**BARRY CROFT, JR.,**
             Defendant.

---

### DEFENDANT'S SENTENCING MEMORANDUM

---

Barry Croft, Jr., by his counsel, Joshua Blanchard, submits this Sentencing Memorandum in support of a sentence below the advisory sentencing guideline range. Such a sentence reflects the nature and circumstances of Mr. Croft's offense and his history and characteristics, and is "sufficient, but not greater than necessary" to serve the purposes of sentencing set forth at 18 U.S.C. § 3553(a).

### INTRODUCTION

### I.    UNRESOLVED OBJECTIONS TO PSIR AND SCORING

¶**5**, ECF No. 787, PageID.10405: Counsel initially raised this issue in his objection letter and believed that the issue was withdrawn after discussion with the probation officer, but perhaps there wasn't clarity in communication. Mr. Croft

1

withdraws the objection to omitting Mr. Harris' acquittal from ¶5 because it is included in ¶12.

¶**10**, ECF No. 787, PageID.10405: This paragraph should include a statement regarding the final 30-month sentence imposed upon Mr. Garbin after the Rule 35. *See* ECF No. 757, PageID.9963.

"The principal function of the presentence report is to assist the court in determining the appropriate sentence." *In re Morning Song Bird Food Litig.*, 831 F.3d 765, 775 (6th Cir. 2016) quoting *United States v. Charmer Indus., Inc.*, 711 F.2d 1164, 1170 (2d Cir. 1983). "[A]ccuracy of sentencing information is important not only to the defendant but also to effective correctional treatment of a convicted offender. *Id.* quoting Fed. R. Crim. P. 32 advisory committee's note, 1974 amendments, subd. (c)(3)(A).

One of the factors the Court must consider in imposing a sentence for Mr. Croft is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". 18 USC §3553(a)(6). The ultimate sentence imposed upon Mr. Garbin is one data point in conducting the §3553(a) analysis and should be included.

¶**14**, ECF No. 787, PageID.10406: During the objection conference and following production of supporting records, counsel objected to the inclusion of the last sentence in ¶14, but the objection appears to have escaped the revision process and was omitted from the summary of objections.

Specifically, the PSR writer alleges that "Mr. Croft and other inmates in his cell were found to be smoking in violation of jail policies on two occasions." *See* PSR at ¶14, ECF No. 787, PageID.10406. The incident report states that a different inmate "is seen grabbing something from his bunk in the shape of a homemade cigarette then go[ing] to the area below their TV, out of camera view". The report goes on to explain that inmates including Croft later walked into this unmonitored area "presumably to smoke". Incident Report, Ex. A. There is insufficient evidence to conclude Mr. Croft violated any jail rules. Counsel notes that the Newaygo County Jail sells e-cigarettes to inmates, including Mr. Croft, through the commissary, so he has no reason nor motivation to break rules relating to cigarettes when they are readily available. Counsel is informed that the jail sells e-cigarettes to inmates at the cost of $12.95 per cigarette with a limit of one e-cigarette per day.

¶**17-20**, ECF No. 787, PageID.10406-10407: Counsel objects to the description of the Wolverine Watchmen without including the undisputed fact that Mr. Croft was not a member of the Wolverine Watchmen nor was he involved in their encrypted chat communications. The manner in which four of the five background paragraphs discuss the Wolverine Watchmen following a paragraph about Mr. Croft and Fox could lead a reader to believe that Mr. Croft was a member of the Wolverine Watchmen. Such unfounded inferences may negatively impact Mr. Croft's classification, placement, and programming with BOP.

¶**23,** ECF No. 787, PageID.10416: Contrary to the note at PageID.10454, there is no outstanding objection to ¶23. The objection raised during the objection

process was resolved by the probation officer adding clarifying language about the multiple confidential human sources in attendance.

¶**24**, ECF No. 787, PageID.10416: Counsel requested the Probation Officer clarify that Mr. Croft did not attend the referenced periodic Wolverine Watchman FTX training exercises.

¶**57**, ECF No. 787, PageID.10423: Counsel objected to the first sentence as factually inaccurate. As the Court is aware from trial testimony[1], Mr. Croft's voice was never heard on this recording which counsel submits is because he was not present for the conversation.

¶**92 & 106**, ECF No. 787, PageID.10432: Mr. Croft objects to this paragraph as factually inaccurate and the leadership enhancement is not properly applied. It does not appear that the offenses for which Mr. Croft was convicted involved five or more participants. A total of six men were identified as participants and two were acquitted. Undercover agents and informants are excluded from the calculation of participants. §3B1.1 n. 1.

"Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature

---

[1] As in the Rule 33 motion, counsel is relying on his best recollection because the Court has declined to authorize production of transcripts prior to a notice of appeal being filed.

and scope of the illegal activity, and the degree of control and authority exercised over others." §3B1.1 n. 4.

Mr. Croft did not have decision-making authority. The trial testimony was that people would become frustrated with Mr. Croft because he was unable to articulate a plan and just kept talking. He did not recruit any of the charged individuals. Mr. Croft was not involved in the encrypted chat communications where details were discussed, and potential plans were floated. He did not exercise authority or control over others.

¶**104**, ECF No. 787, PageID.10435: §2X1.1(b)(2) explains that the offense level should be reduced by 3 levels "unless the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond their control."

The trial testimony was unambiguous that there was no actual plan in place to kidnap the Governor. During both trials, the Court and Government would often note that no actual plan was even required to sustain a conviction. Neither of the cooperating defendants could identify the who, what, when, or where of the plan. The defendants were not in possession of the tools necessary to carry out such a plot, including the explosives which formed the basis for count 2 or the varying number of boats that government witnesses testified would be used to complete the kidnapping. There was no consensus on how to fund the plan and no funding source

5

in place. The participants believed that more training was required before any actions could be taken. As such, Mr. Croft should receive the reduction contemplated by §2X1.1(b)(2).

¶**109**, ECF No. 787, PageID.10435: The base offense level should be determined by USSG §2K1.4(a)(4) rather than §2K1.4(a)(1)[2].

The proposed scoring of 24 points is premised on the offense "involv[ing] the attempted destruction of a place of public use". The superseding indictment alleged that Mr. Croft agreed to use a weapon of mass destruction for the purpose of "harming and hindering the Governor's security detail and any responding law enforcement officers." While true that Mr. Fox inspected the underside of a bridge and there may have been text message communications of which Mr. Croft was not aware regarding the possibility of blowing up a non-specific bridge, it can hardly be said that there was an attempt to destroy the bridge. No member of the conspiracy ever possessed an explosive capable of destroying the bridge.

The lack of progress toward any destruction places this case apart from cases addressing §2K1.4 such as *United States v. Gembala*, 27 F. App'x 475, 477 (6th Cir. 2001) (scoring under §2K1.4(a)(2) where a defendant attempted to burn down a bar by throwing a lit Molotov cocktail at the wall); *United States v. Johnson*, 116 F.3d 163 (6th Cir. 1997) (the defendants burned a cross at a church before attempting to set it ablaze); *United States v. Johnson*, 152 F.3d 553 (6th Cir. 1998) (defendant

---

[2] This objection did not benefit from the normal objection conference process as the scoring was changed by the Probation Officer after the draft PSR was produced in light of the Court's observation in the order at ECF No. 783.

actually set church on fire); *United States v. Georgia*, 279 F.3d 384 (6th Cir. 2002) (set church on fire to collect insurance proceeds).

Because there was no attempt to destroy a "place of public use", pursuant to §2K1.4(a)(4), the base offense level should be calculated by adding two levels to the offense level from §2B1.1(a)(1) resulting in a base offense level of 9.

If sustained, this objection also impacts ¶115 relating to multiple count adjustments.

**¶111**, ECF No. 787, PageID.10435: Mr. Croft objects to the enhancement found at §3A1.4 relating to terrorism.

There appear to be two elements to the terrorism enhancement from §3A1.4. First, as relevant here, the offense must be a "a violation of . . . 2332a (relating to use of weapons of mass destruction)". 18 USC §2332b(g)(5)(B).

Second, the government must prove by a preponderance that the defendant's offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 USC 2332b(g)(5)(A).

The superseding indictment alleged that "[t]he object of the conspiracy was to use weapons of mass destruction . . . against persons or property within the United States. The defendants intended to use the destructive devices to facilitate their plot to kidnap the Governor, by harming and hindering the Governor's security detail and any responding law enforcement officers." Superseding Indictment, ECF No. 172, PageID.967.

The indictment does not allege that the WMD conspiracy to was for any purpose other than to use the WMD in furtherance of the plot to kidnap the Governor.[3] Further, the government tried the case on the theory that Mr. Croft wanted to spark a civil war or that he believed his actions in this case would touch off a civil war. To the extent that the behavior was intended to motivate the populace to act rather than the government, it does not fit within the terrorism enhancement. *See United States v. Parr*, 545 F.3d 491, 504 (7th Cir. 2008) (noting that a threat to commit a bombing was not calculated to influence or affect the conduct of government when it was uttered to a cellmate).

## II.    NATURE AND CIRCUMSTANCES OF MR. CROFT'S OFFENSE

Mr. Croft was convicted following a second jury trial of Conspiracy to Kidnap, Conspiracy to Use a Weapon of Mass Destruction, and Possession of an Unregistered Destructive Device.

Mr. Croft came to the attention of the federal government after he began posting anti-law enforcement statements on Facebook. Mr. Croft believed that the FBI had arranged the murder of his online friend[4], Kevin Lyndel "KC" Massey and he said mean, awful things in response. Mr. Massey was the leader of a Texas anti-immigration militia called Rusty's Rangers. Derek Hawkins and Marisa Iati, *A*

---

[3] To the extent that the enhancement is being applied because the Governor was targeted in her role as a Government official and her behavior was being influenced, this would result in impermissible double-counting because her role as a government official is already counted in §3A1.2(b).

[4] While clear that Mr. Croft purported to have been in communication with Mr. Massey, the extent of their relationship and whether they ever met in person is unclear.

8

*Texas militia leader went into hiding. Months later, he turned up dead*, WASH. POST,

Jan. 13, 2020, https://wapo.st/3YdKhQ3. Massey was eventually found dead in the

woods with a gunshot wound to the head. *Id.*

As a result of a referral from the Dallas FBI about Croft's Massey-related

posts, agents in Delaware began monitoring Mr. Croft and eventually targeted him

for in-person contact by FBI-paid confidential human sources, including Stephen

Robeson and Jennifer Plunk.

The allegations in this case were that Mr. Croft and others conspired to

kidnap the Governor of Michigan. The government has variously presented motives

for members of the conspiracy such as frustration growing from COVID-19, a desire

to start a civil war, a desire to commit suicide, and other reasons.

Following his arrest in October 2020, Mr. Croft was detained at the Federal

Detention Center in Philadelphia for approximately three months before his transfer

to this District. Since his arrival in the district, Mr. Croft was detained primarily at

the Newaygo County Jail, except for his detention at the Kent County Jail while he

was on trial each time. Contrary to the PSR writer's assertion that Mr. Croft and his

cellmates violated jail rules regarding smoking, he has not been a management

problem and has complied with jail rules. Throughout the pretrial and trial stages,

Mr. Croft has been fully engaged, cooperative, and respectful.

## A.  MR. CROFT'S HISTORY AND CHARACTERISTICS.

Mr. Croft's history and characteristics suggest that a sentence below the

advisory guideline range is appropriate. The advisory guideline range as scored by

Probation calls for a total sentence of life in prison. PSR at ¶165, ECF No. 787, PageID.10449. The United States Probation Officer is recommending a life sentence followed by 5 years supervised release. PSR, Sentencing Recommendation, ECF No. 787, PageID.10460.

A considered view of Mr. Croft's 47[5] years of life discloses that he has suffered from significant substance abuse issues, has likely self-medicated an untreated mental health issue, has engaged in poor decision making, has suffered some serious setbacks and is someone who was without the appropriate tools to be productive. However, Mr. Croft's life shows that he is not a lost cause and, if equipped with the right tools, can return to live a productive law-abiding life. Mr. Croft's redeeming qualities include: a genuine concern for his family, family and community ties, a strong work ethic, and his current age.

Mr. Croft was born in 1975 in Wilmington, DE to Barry Croft, Sr., and Rosmarie McGuire. PSR at ¶142, ECF No. 778, PageID.10443. Both of his parents have struggled with mental health issues throughout their lives. While Mr. Croft did not report mental illness on his father's part, he described him as someone who has "always been sort of an odd duck" and "reads books about aliens". PSR at ¶142, ECF No. 787, PageID.10443. However, Mr. Croft's paternal aunt explained that her brother (Mr. Croft's father) was "cold and detached" noting that he "was almost entirely uninvolved in the defendant's life". She further explained that Mr. Croft's

---

[5] Mr. Croft will turn 47-years-old in between filing and sentencing. *See* PSR, ECF No. 787, PageID.10403.

father "puts aluminum foil on the ceiling of his bedroom so aliens cannot access his brain waves." *Id.* She went on to describe that as a child Mr. Croft "longed for his father's approval but never received it because his father was incapable of connection in that way." *Id.*

Similarly, Mr. Croft's mother has suffered from mental health issues serious enough that she receives social security disability payments as a result. PSR at ¶143, ECF No. 787, PageID.10443. Mr. Croft's paternal aunt reports that only recently has his mother begun to stabilize and adhere to a medication regime. *Id.* She further noted that Mr. Croft's mother is also "prone to conspiracy theories" and she suspects that Mr. Croft also suffers from similar mental health issues. *Id.*

In 1990, at age 14, Mr. Croft was admitted to the Rockford Center, an inpatient psychiatric hospital. The admitting diagnosis was "Adjustment disorder with mixed features of emotions and conduct. Rule out bipolar disorder. Passive Personality Disorder." On Axis III, the clinician noted interfamily conflict as a concern. *See* Rockford Center Records, Ex. B. The justification for admitting Mr. Croft to the hospital was that he had suffered from "[d]eteriorating psychotic condition over the last three weeks." *Id.* In the weeks leading up to his admission, he was experiencing serious mood swings and didn't understand the cause. *Id.* at p. 2. He was experiencing nightmares and night terrors. *Id.* The clinician noted that Mr. Croft had been struggling in school and had been cited many times for not being able to sit still in class. *Id.*

The clinician noted that fourteen-year-old Croft was "preoccupied with his feeling of not being wanted." *Id.* During therapy, the clinicians noted that Mr. Croft "remained anxious and nervous and talked about being afraid of 'things' at his window and having a difficult time dealing with his mother." *Id.*

While hospitalized, the clinicians tried a number of psychiatric medications including: Desyrel (Trazadone, a serotonin modulator used to treat marjor depressive disorder) 50mg and later 75mg, Tegretol (an anti-convulsant used in treating schizophrenia and bi-polar) 200mg twice daily, and Triavil 2-10 and 4-10 (used to treat agitation, anxiety, and schizophrenia). He was ultimately discharged with a recommendation of therapy in the Newark area and a prescription for Triavil 2-10, one in the morning, two at bedtime. *Id.* Counsel has found no indication that Mr. Croft ever received the recommended therapy.

Almost three years later, Mr. Croft was back at the Rockford Center. *Id.* His admission was precipitated by a breakup with a girlfriend after which he took several aspirins, but he denied it was a suicide attempt. *Id.* However, Mr. Croft was only discharged from the Rockford Center when it "was decided then that the patient was no longer suicidal." *Id.*

Other than continuing to suggest that affective disorder and bipolar be ruled out, the second admission records make no reference to the mental health issues which warranted the prior admission, the prior prescription for Triavil 2-10, and provides no explanation for why the medication ceased.

12

This appears to have been Mr. Croft's last interaction with the mental health system.

Mr. Croft's parents divorced when he was four years old. PSR at ¶145, ECF No. 787, PageID.10443. He resided with his father until around age 15 when his father abruptly decided to move the family to Pennsylvania to live with a girlfriend. *Id*. This prompted Mr. Croft to run away from home. *Id*.

Mr. Croft's aunt reports that it was around this time that Mr. Croft developed a serious heroin addiction. *Id*. She further opined that Mr. Croft's criminal history as a young man was to fund his drug habit, which seems consistent with the description of the offenses. PSR at ¶156, ECF No. 787, PageID.10446. Ms. Croft was proud of Mr. Croft "overcoming his [drug] addiction" but she did not comment on his continuing heavy marijuana use. *Id*.

Mr. Croft reports using heroin, cocaine, and PCP in his late teens. PSR at ¶156, ECF No. 787, PageID.10446. He began using marijuana heavily by age 13. *Id*. By the time of this offense, according to his fiancé, Mr. Croft was smoking marijuana "more than twice a day" as "sort of a constant thing". Chasity Knight Tr. (March 30, 2022), ECF No. 663, PageID.8274. Mr. Croft reported using 2 ounces per week, equivalent to roughly 16 one-half gram joints per day, every day. PSR at ¶156, ECF No. 787, PageID.10446.

This offense represents Mr. Croft's first contact with the federal criminal justice system. He previously had a series of convictions[6] between age 18 and 21 which his aunt attributes to funding his drug addiction. PSR at ¶156, ECF No. 787, PageID.10446. More than a decade later, at age 33, Mr. Croft was convicted of a marijuana possession offense in Kansas. PSR at ¶131, ECF No. 787, PageID.10441. Another 8 and 10 years later, Mr. Croft was again charged with marijuana offenses. *Id.* at ¶¶132, 133.



*Trial Exhibit depicting Mr. Croft and his daughters at an "old time photo gallery" during the weekend of the Cambria FTX.*

Mr. Croft is the father to three daughters. Prior to his incarceration on this offense, Mr. Croft had primary custody of his daughters. While the government makes much of Mr. Croft taking his daughters to the Cambria event and telling his daughter to step away when he was making "explosives", he loves his children very much, worked hard to be involved in their lives and tried to provide the love his father was incapable of providing to him.

---

[6] As noted by the PSR, these convictions were the subject of a pardon by the Governor of Delaware.

**B.  TO REFLECT THE SERIOUSNESS OF THE OFFENSE, PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE.**

As the Court is well aware, §3553(a)(2)(A) requires the Court to consider "the need for the sentence imposed…to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense." These sentencing objectives set forth in § 3553(a)(2)(A) are generally referred to, collectively, as "retribution," which has been defined as follows:

> First, retributive, or "just desserts," theory considers only the defendant's past actions, not his or her probable future conduct or the effect that the punishment might have on crime rates or otherwise. Second, retribution examines the actor's degree of **blameworthiness** for his or her past actions, focusing on the offense being sentenced. . . . Third, the degree of blameworthiness of an offense is generally assessed according to **two kinds of elements**: the **nature and seriousness of the harm caused or threatened** by the crime; and the **offender's degree of culpability in committing the crime, in particular, his degree of intent (*mens rea*), motives, role in the offense, and mental illness or other diminished capacity**.

Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005) (emphasis supplied).

Mr. Croft understands the seriousness of the offense for which he has been convicted. He understands that he is facing a lengthy prison sentence. In attempting to place Mr. Croft's actions on the continuum of behavior that can be prosecuted under 18 USC §1201(c) or §2332a, it is worth considering that this was an inchoate offense, while the statutes also capture completed kidnapping and WMD offenses which this was far from being.

15

It is also worth noting that Mr. Croft did not supply funding to the group, he did not provide training to the group, he was not involved in most of the "FTX" events, nor was he involved in the encrypted chat conversations. Simply put, to the extent that the jury determined he was a participant, as they necessarily did, he was a participant to a lesser degree than others. The testimony was clear that Mr. Croft had less contact with the other defendants than anyone else and virtually no contact following the September "FTX".

When it came time to arrest everyone, Mr. Croft wasn't even in the state. Not because he was trying to evade capture, but because he was driving a semi-tractor to support his children. When the FBI arrested Mr. Croft, he did not run, fight, argue, or resist. In fact, he sat down for a long post-arrest interview where he ate a cheeseburger and answered the agents' questions. From his arrest through present, Mr. Croft has been polite, cooperative, and respectful of the process.

## C. TO AFFORD ADEQUATE DETERRANCE TO CRIMINAL CONDUCT.

Section 3553(a)(2)(B) requires the court to consider "the need for the sentence imposed...to afford adequate deterrence to criminal activity." A leading scholar on federal sentencing is debunking the myth that lengthy sentences have a deterrent effect. She writes:

> Indeed, while many believe that the higher the sentence, the greater the effect in deterring others, the empirical research shows no relationship between sentence length and deterrence. The general research finding is that "deterrence works," in the sense that there is less crime with a criminal justice system than there would be without one. But the question for the judge is "marginal deterrence," *i.e.*, whether any particular quantum of punishment results in increased deterrence and thus decreased crime. Here the findings are uniformly negative: there is

16

no evidence that increases in sentence length reduce crime through deterrence. "Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).

Amy Baron Evans, Sentencing By the Statute (April 27, 2009, revised December 21, 2010),https://www.fd.org/sites/default/files/criminal_defense_topics/essential_topics/ sentencing_resources/sentencing-by-the-statute.pdf.

It appears there is little or no positive correlation between the length of sentence and general deterrence. More important is that people who commit crimes be held accountable. Mr. Croft will be held accountable: he has been apprehended, he has already been incarcerated for over two years, he faces a significant prison term, and a lengthy period of supervised release.

The advisory guideline range here calls for Mr. Croft to spend the rest of his life in prison. That is simply longer than is necessary to effect specific or general deterrence.

## D. TO PROTECT THE PUBLIC FROM FURTHER CRIMES BY MR. CROFT.

Mr. Croft had a long period without significant criminality. His youthful, pardoned convictions appear to have been related to a heroin addiction. Interestingly, while a different drug was at play here, there is a connection between his substance abuse and his conduct.

The public can be sufficiently protected from potential future crimes by Mr. Croft through ensuring that he remains 1) sober and 2) under supervision of a United

States Probation Officer. While a period of incarceration may be warranted under other provisions of §3553(a), lengthy incarceration is not necessary to protect the public from Mr. Croft.

Based on Mr. Croft's true Criminal History Points, the United States Sentencing Commission has found that he is in one of the lowest categories to recidivate:



Figure 6.
Rearrest Rates for Recidivism Study Offenders by Criminal History Points

Based on his current age, regardless of the sentence imposed by the Court, on release Mr. Croft would be in one of the lowest age groups to re-offend:



Figure 11.
Rearrest Rates for Recidivism Study Offenders by Age at Sentencing and Release

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

### E. TO PROVIDE MR. CROFT WITH NEEDED EDUCATIONAL OR VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER CORRECTIONAL TREATMENT IN THE MOST EFFECTIVE MANNER.

Mr. Croft is presently 47 years old. While he holds a CDL and has a solid employment history, he could benefit from learning a new trade, perhaps one where he spends less time isolated.

Both of Mr. Croft's biological parents appear to suffer from significant mental illness. Mr. Croft was twice hospitalized as a child. The record is replete with references to Mr. Croft smoking copious amount of marijuana. Counsel suspects that Mr. Croft was self-medicating with marijuana to address other concerns. At a minimum, Mr. Croft could benefit from comprehensive substance abuse treatment and may benefit from a psychological assessment and treatment.

Any sentence fashioned by the Court should consider Mr. Croft's history of substance abuse and mental health concerns.

### F. THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES AMONG SIMILARLY SITUATED DEFENDANTS.

Mr. Garbin was originally sentenced to 75 months custody. His sentence was subsequently reduced to 30 months. His initial sentence included a 5K1.1 motion and his ultimate sentence accounted for a Rule 35 reduction. Mr. Franks received a sentence of 48 months, which included a 5K1.1 reduction. Both presumably also received a reduction for acceptance of responsibility.

19

Mr. Garbin and Mr. Franks testified that their roles in this conspiracy were to be operators on a kill squad. They testified that trained and agreed to carry out a kidnapping and to kill people in the process. Mr. Franks hoped to die in the process of killing others. Mr. Garbin supplied the property on which to train and constructed the training grounds.

Certainly, some upward adjustment must be made to account for the differences between Mr. Croft and Mr. Garbin or Mr. Franks in not providing substantial assistance and §3E1.1. However, a sentence which varies substantially below the guideline range is necessary to avoid an unwarranted sentencing disparity.

## III.  A DOWNWARD VARIANCE FROM THE ADVISORY GUIDELINE RANGE IS APPROPRIATE.

Courts are not required to impose a sentence within the range recommended by the United States Sentencing Guidelines.  *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738 (2005).  The Guidelines, "formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 128 S.Ct. 558, 564 (2007) (internal quotations omitted); *Gall v. United States*, 128 S.Ct. 586, 602 (2007) (same).  Courts "may vary [from the Guideline ranges] based solely on policy considerations, including disagreements with the Guidelines".  *Kimbrough*, 128 S.Ct. at 570.

When a Court disagrees with the Guidelines, the courts of appeal may not "grant greater factfinding leeway to [the Commission] than to [the] district judge." *Rita v. United States*, 127 S.Ct. 2456, 2465, 2468 (2007).  The Guidelines deserve

some level of deference from the Court when they are based on (1) empirical evidence of pre-guideline sentencing practice and (2) periodic review/revision in light of judicial decisions, sentencing data, and comments from participants and experts in the field. *Rita,* 127 S.Ct. at 2464-65. However, as the Supreme Court noted, "not all of the Guidelines are tied to this empirical evidence." *Gall*, 128 S.Ct. at 594 n.2. When a guideline is not the product of "empirical data and national experience," it is not an abuse of discretion to conclude that it fails to achieve the purposes of sentencing, as set forth in 18 U.S.C. § 3553(a), even in the average case. *Kimbrough*, 128 S.Ct. at 575.

Because the "Guidelines are not the only consideration," the Court, "after giving both parties an opportunity to argue for whatever sentence they deem appropriate," "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by the party." *Gall* at 596. The Court must "impose a sentence sufficient, but not greater than necessary" to achieve the goals of sentencing. *Id* at 597. In doing so, the Court must independently evaluate the appropriate sentence in light of § 3553(a), consider arguments that the guidelines should not apply on general policy grounds or case specific grounds, but "may not presume that the Guidelines range is reasonable." *Rita,* 127 S.Ct. at 2463, 2465, 2467-68; *Gall*, 128 S.Ct. at 596-97.

## APPLICATION TO MR. CROFT'S CASE

In Mr. Croft's case, a downward variance is warranted because (a) the Guidelines are not tied to empirical evidence to support the recommended sentence

and, consequently, (b) result in a sentence that is too harsh or "greater than necessary" to achieve the goals of sentencing. A sentence at or within the guideline range is not required to accomplish the goals of 18 U.S.C. §3553(a).

The recommended guideline sentence is largely driven by the enhancements, including the terrorism enhancement which both adds 12 offense levels and artificially adjusts the criminal history category to VI resulting in a recommended guideline sentence that is disproportionate to the inchoate conspiracy offenses for which Mr. Croft was found guilty by a jury.

As such, a downward variance is appropriate to rectify the unjust application of the guidelines.

## IV.   CONCLUSION

Because a sentence below the advisory guideline range would be "sufficient, but not greater than necessary" to accomplish the goals of sentencing under 18 U.S.C. § 3553(a), Mr. Croft requests a downward variance to a sentence that is sufficient but not greater than necessary to accomplish the goals of sentencing.

Respectfully submitted:
**BLANCHARD LAW**

Dated: December 15, 2022         /s/ Joshua A. Blanchard
                                 Joshua Blanchard
                                 309 S. Lafayette St., Ste. 208
                                 P.O. Box 938
                                 Greenville, MI 48838
                                 616-773-2945
                                 josh@blanchard.law